**Keith Alan WADE, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 10–96–174–CR.

Court of Appeals of Texas, Waco.

Aug. 20, 1997.

Discretionary Review Refused Nov. 26, 1997.

---

Kathryn J. Gilliam, Waco, for appellant.

John W. Segrest, Criminal District Attorney, Susan N. Kelly, Asst. District Attorney, Waco, for appellee.

Before DAVIS, C.J., and CUMMINGS and VANCE, JJ.

## OPINION

DAVIS, Chief Justice.

A jury convicted Keith Alan Wade of aggravated assault and assessed punishment at five years' confinement. Wade now appeals by six points of error attacking the wording of the indictment, the legal and factual sufficiency of the evidence, and the trial court's failure to instruct the jury regarding the terms of community supervision. Because the wording of the indictment is not erroneous, the evidence is sufficient, and the trial court did not err in the charge, we affirm.

In his first point of error, Wade contends that the State's indictment only charged him with simple assault, rather than aggravated assault, which removed this case from the district court's jurisdiction. The indictment alleged in part:

KEITH ALAN WADE, hereinafter styled Defendant, heretofore on or about the 29th day of September, A.D.1995, and before the presentment of this indictment, in the County and State aforesaid; did then and there intentionally and knowingly cause bodily injury to KAREN SCHULZ by striking her, and did then and there use a deadly weapon, to-wit: a knife.

The essence of Wade's complaint is that the indictment fails to allege the deadly weapon was the means used to inflict the bodily injury.

An indictment serves two functions. *Cook v. State*, 902 S.W.2d 471, 475 (Tex.Crim.App. 1995). First, it provides notice of the offense in order to allow a defendant to prepare a defense. *Id.* Second, an indictment serves a jurisdictional function. *Id.* Jurisdiction vests only upon the filing of a valid indictment in the appropriate court. *Id.* at 476.

Article V, § 12(b) of the Texas Constitution defines an "indictment" as "a written instrument presented to a court by a grand jury charging a person with the commission of an offense." TEX. CONST. art. V, § 12(b); *Cook,* 902 S.W.2d at 477; *Studer v. State,* 799 S.W.2d 263, 265 (Tex.Crim.App. 1990). Thus, to comprise a valid indictment within the definition provided by the Constitution, an indictment must charge: (1) a person; (2) with the commission of an offense. *Cook,* 902 S.W.2d at 477. An indictment may properly charge the offense of aggravated assault by alleging (1) the defendant (2) intentionally, knowingly, or recklessly (3) caused bodily injury to another and (4) used a deadly weapon. TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a)(2) (Vernon 1994); *Butler v. State,* 928 S.W.2d 286, 288 (Tex. App.—Fort Worth 1996, pet. ref'd).

Wade contends the indictment alleges only simple assault because it alleges he struck Schulz "and" he used a deadly weap-

on. Under Wade's construction, the indictment must have alleged that he caused Schulz's bodily injury "by" using a deadly weapon. However, bodily injury caused by a deadly weapon is not a necessary element of aggravated assault. Rather, the defendant must intentionally, knowingly, or recklessly cause bodily injury to another *and* use a deadly weapon during the assault. Therefore, the failure to allege that the deadly weapon caused the bodily injury does not render the indictment insufficient to charge aggravated assault. The indictment in this case properly charged Wade because it alleged all the essential elements of aggravated assault. *Butler*, 928 S.W.2d at 288.

■ Moreover, as a general rule, an indictment in the language of the statute creating and defining the charged offense will be sufficient. *Beck v. State*, 682 S.W.2d 550, 554 (Tex.Crim.App.1985). The indictment charging Wade was sufficient because it tracked the language of the statute creating and defining aggravated assault. We overrule the first point.

■ Wade's second point claims that the indictment was fundamentally defective because it failed to allege the necessary culpability with regard to the use of the deadly weapon. A second culpable mental state is not required to be proved in connection with the aggravating element of the use of a deadly weapon. *Butler*, 928 S.W.2d at 288; *Peacock v. State*, 690 S.W.2d 613, 615–16 (Tex.App.—Tyler 1985, no pet.); *Pass v. State*, 634 S.W.2d 857, 860 (Tex.App.—San Antonio 1982, pet. ref'd). Because the indictment alleged Wade intentionally and knowingly caused bodily injury, it was not necessary to allege that Wade intentionally and knowingly used a deadly weapon. Point two is overruled.

■ Wade complains in his third point that the evidence is legally insufficient to support his conviction for aggravated assault as alleged in the indictment. By this point, Wade contends there is no evidence to show that he used a knife to inflict bodily injury upon Schulz. In conducting a legal sufficiency review, we determine whether, after viewing the evidence in the light most favorable

to the verdict, any rational trier of fact could have found the challenged elements beyond a reasonable doubt. *Moore v. State*, 935 S.W.2d 124, 126 (Tex.Crim.App.1996). The jury is the sole judge of the weight of the evidence and may choose to believe all, some, or none of it. *Id.* Reconciliation of conflicts in the evidence is within the exclusive province of the jury. *Id.*

■ The elements of aggravated assault are (1) the defendant (2) intentionally, knowingly, or recklessly (3) caused bodily injury to another and (4) used a deadly weapon. TEX. PENAL CODE ANN. §§ 22.01(a)(1), 22.02(a)(2); *Butler*, 928 S.W.2d at 288. Under section 22.02(a)(2), an aggravated assault occurs when a person commits a simple assault "and" uses a deadly weapon during the commission of the assault. The word "and" has the same meaning as the phrases "as well as" and "at the same time." *Pass*, 634 S.W.2d at 862. Although a deadly weapon must be used at the same time as the assault occurs, nothing in the language of this statute requires that a deadly weapon actually cause the bodily injury.

■ The word "use" is commonly employed to describe conduct in which the verb's object (in this case, a deadly weapon) is utilized in order to achieve a purpose. *Patterson v. State*, 769 S.W.2d 938, 941 (Tex. Crim.App.1989). In other words, the deadly weapon must be utilized, employed, or applied in order to achieve its intended result. *Id.* The use of a deadly weapon extends to *any* employment of a deadly weapon, even its simple possession, if such possession facilitates the associated offense. *Id.* The "use" of a deadly weapon during an aggravated assault certainly refers to inflicting of bodily injury, but it can also refer to simple possession of a knife if the possession facilitated the aggravated assault. Thus, a deadly weapon can be "used" in an aggravated assault without directly causing the bodily injury.

During her testimony, Schulz testified that Wade "pulled out the knife and put it up against my nose, cut the tip of my nose. He then put it against my neck." Viewing this testimony in the light most favorable to the verdict, any rational trier of fact could have

found that Wade "used" the knife when he assaulted Schulz. *Moore,* 935 S.W.2d at 126. We overrule Wade's third point.

■ Wade's fourth point alleges that the evidence is factually insufficient to support his conviction for aggravated assault as charged in the indictment. In conducting a factual sufficiency review, we view all the evidence without the prism in the light most favorable to the verdict and set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State,* 922 S.W.2d 126, 134 (Tex.Crim.App.1996). The appropriate balance between the jury's role as the judge of the facts and our duty to review criminal convictions is maintained when we do not "find" facts, or substitute our judgment for that of the jury. *Id.* at 135. Rather, we reverse the verdict and remand for a new trial only when the verdict is against the *great* weight of the evidence presented at trial so as to be *clearly wrong and unjust. Id.*

We now look at all the evidence to determine if Wade used the knife to facilitate an assault on Schulz that caused her injuries rather than the defense's theory that she fell down a flight of stairs. In order to achieve an accurate reflection of the events surrounding this assault, we set out the pertinent testimony at length. Schulz testified regarding Wade's use of the knife and her injuries as follows:

SCHULZ: [H]e reached in his right back pocket, and pulled out the knife.

PROSECUTOR: Describe the knife for us.

SCHULZ: It had a black handle, about a six-inch silver blade.

PROSECUTOR: Was it a typical pocket knife, or can you describe, did the blade come out?

SCHULZ: Well, he went like that.

PROSECUTOR: Like a switch blade?

SCHULZ: I don't know.

PROSECUTOR: He went like that, and it opened?

SCHULZ: Yes.

PROSECUTOR: Now, what were you doing, could you not get away from him, or what was the situation?

SCHULZ: Well, at the time, I was still up against the bar, and he had me pinned up against it with his arm, and reached in his back pocket, and pulled out the knife.

PROSECUTOR: What did he do with the knife?

SCHULZ: He had me by one arm by the neck up against the wall, he pulled out the knife and put it up against my nose, cut the tip of my nose. He then put it up against my neck.

PROSECUTOR: What did he say to you when he did that?

SCHULZ: Something about Nicole Simpson. I would end up like Nicole Simpson, or did I want to end up like her.

PROSECUTOR: What did you say?

SCHULZ: I asked him to please put the knife away. I asked him please not to hurt me.

. . .

PROSECUTOR: Were you trying to get out of the apartment?

SCHULZ: Yes.

PROSECUTOR: Tell us about how you tried to get out.

SCHULZ: After I asked him not to hurt me, he took the knife and threw it in the kitchen wall over on that left side, it stuck in the wall, and I ran towards the front door. I went downstairs.

. . .

SCHULZ: At that point he followed me downstairs, pulled the knife out of the kitchen wall, and went to my car, ran in front of me, and stabbed all four of the tires, so I couldn't leave.

PROSECUTOR: Were you out there at this point?

SCHULZ: Yes.

PROSECUTOR: So you saw him do that?

SCHULZ: He had the knife in his hand. I wasn't about to go near him with it.

. . .

SCHULZ: After the tire business, I confronted him, he came and knocked me down, we were in the parking area right

here, and he came running at me, and knocked me down.

PROSECUTOR: What happened when you fell?

SCHULZ: I broke my wrist and my hand.

. . .

PROSECUTOR: Tell the jury about your injuries, we have talked about them sort of scattered, but if you could summarize all of your injuries?

SCHULZ: I had a butterfly on the right eye, I had a cut to the tip of the nose, these three fingers were broken. My hand, and a fracture to the wrist, and one in the forearm here, and two black eyes, that's about it, just sore.

PROSECUTOR: Were you in a lot of pain?

SCHULZ: Yes.

. . .

DEFENSE COUNSEL: And when you ran away from him, and he ran ahead of you to slash your tires, you didn't try to escape from him then?

SCHULZ: Well, he had a knife in his hand, and no, he had already put it up to my throat, and I wasn't about to go near him.

Officer Robert Lanning was working security at the hospital on the night Wade brought Schulz in for treatment of her injuries. He testified regarding Schulz's injuries as follows:

PROSECUTOR: And what did you see, what were her injuries that you could tell?

OFFICER LANNING: She had, I believe it was her right eye blackened, and she also had some type of injury to her left wrist or forearm, and she had an ice pack over it, I couldn't tell for sure what it was.

. . .

DEFENSE COUNSEL: You saw the cuts, apparently on her nose and face?

OFFICER LANNING: I saw a black eye.

DEFENSE COUNSEL: Did she have any cuts on her face or on her nose?

OFFICER LANNING: She may have, I didn't look that closely.

DEFENSE COUNSEL: You didn't see any cuts on her face or on her nose?

OFFICER LANNING: Like I said, I didn't examine her. I didn't make an offense report.

DEFENSE COUNSEL: Did you see any cuts on her neck?

OFFICER LANNING: No, not that I can recall.

Officer Lanning became suspicious that the true cause of Schulz's injuries was an assault, rather than a fall down some stairs. This suspicion was later validated when the nurse treating Schulz told Officer Lanning that she did not believe Schulz's injuries were consistent with falling down stairs. Thereafter, he notified other members of the Waco Police Department to investigate. Officers Kellum and Kinlaw soon arrived at the hospital to investigate the apparent assault upon Schulz. They also testified about Schulz's condition that night at the hospital.

OFFICER KELLUM: She was very upset, frightened, she was kind of bent over, and her left arm was in a cast. Her right eye was swollen and discolored, and she had scratched around the corner right here.

. . .

DEFENSE COUNSEL: When you observed Karen Schultz, you said she had some cuts on her eyes?

OFFICER KELLUM: Some scratches.

DEFENSE COUNSEL: She had some scratches on her eye, did she have any cuts on her face, did you see?

OFFICER KELLUM: I do not recall.

DEFENSE COUNSEL: Did she have any cuts on her neck?

OFFICER KELLUM: I can't recall.

. . .

OFFICER KINLAW: When I first saw Ms. Schulz, I did observe a swollen area around her right eye, and her arm was in a sling.

DEFENSE COUNSEL: Did she have any cuts on her face?

OFFICER KINLAW: There were some small scratches or abrasions in the area of the swelling.

DEFENSE COUNSEL: That would be consistent with what, a brush?

OFFICER KINLAW: I would assume those type of scratches could be caused by any number of things.

DEFENSE COUNSEL: Did you notice if she had any cuts on her neck at all?

OFFICER KINLAW: I don't recall any.

The medical records of Schulz's emergency room treatment were introduced into evidence. These medical records indicate a fractured left wrist and a bruised and swollen right eye. However, they provide no indication that Schulz had a cut on her nose or neck.

When reviewing Wade's factual sufficiency challenge, we compare the evidence which tends to prove he used a knife in his assault of Schulz with the evidence tending to prove the contrary. In this comparison, we must give due deference to the jury's conclusions regarding the weight and credibility of the evidence. *Clewis*, 922 S.W.2d at 133.

Schulz steadfastly testified that Wade cut her on the tip of the nose with a knife. However, she did not testify that she was cut or bruised in any way during the time the knife was to her neck. The officers did not recall seeing a cut on Schulz's nose or neck. The medical records also do not indicate any cut on Schulz's nose or neck. These medical records document only the obvious injuries to the broken wrist and swollen right eye. The officers' testimony and the medical records do not corroborate Schulz's testimony about the knife, but they do not refute it either. We must give due deference to the jury's conclusions regarding the weight and credibility of the evidence. *Id.* at 133. From this record, we cannot conclude that the jury's verdict is against the great weight of the evidence so as to be clearly wrong and unjust. *Id.* at 134. Accordingly, we overrule Wade's fourth point.

■ In his fifth point, Wade claims that the evidence is legally insufficient to support a finding that a knife as allegedly used by him in the indictment was proved to be a deadly weapon. Under Texas law, a deadly weapon is defined as: (1) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (2) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury. TEX. PENAL CODE ANN. § 1.07(a)(17). Generally, a knife is not a deadly weapon by design.[1] *Thomas v. State*, 821 S.W.2d 616, 620 (Tex.Crim.App.1991); *Hatchett v. State*, 930 S.W.2d 844, 848 (Tex. App.—Houston [14th Dist.] 1996, no pet.); *Johnson v. State*, 919 S.W.2d 473, 477 (Tex. App.—Fort Worth 1996, pet. ref'd); *Revell v. State*, 885 S.W.2d 206, 209 (Tex.App.—Dallas 1994, pet. ref'd). However, the State may prove a particular knife to be a deadly weapon by showing its size, shape, and sharpness, the manner of its use or intended use, and its capacity to produce death or serious bodily injury. *Hatchett*, 930 S.W.2d at 848; *Johnson*, 919 S.W.2d at 477. Each case is examined on its own facts to determine whether the jury could have concluded from the surrounding circumstances that the knife was used or intended to be used as a deadly weapon. *Revell*, 885 S.W.2d at 209. These surrounding circumstances can include a defendant's verbal threats, the distance between the defendant and the victim, and the witness's description of the knife. *Id.*

■ If the evidence does not show that the knife caused death or serious bodily injury, then the State must produce evidence that shows the knife (1) was capable of causing serious bodily injury and (2) was displayed or used in a manner which establishes the intent to cause death or serious bodily injury.[2] *Id.*; *Johnson*, 919 S.W.2d at 477. The evidentiary linchpin necessary for a jury's decision that a knife was a deadly weapon is evidence proving that, in the manner it was used, the knife blade was *capable* of producing death or serious bodily injury.

---

1. Some knives, such as bayonets, scimitars, and swords, qualify as deadly weapons because they are designed for the purpose of inflicting death or serious bodily injury. *Thomas*, 821 S.W.2d at 620.

2. An intent to inflict serious bodily injury or death may be shown by evidence of assertive conduct by an attacker. *Johnson*, 919 S.W.2d at 477.

*Johnson,* 919 S.W.2d at 480. Wounds need not be inflicted before a knife can be found to be a deadly weapon. *Revell,* 885 S.W.2d at 209; *Miller v. State,* 846 S.W.2d 365, 369 (Tex.App.—Houston [14th Dist.] 1992, no pet.).

Schulz testified that Wade pinned her against a wall and cut her nose with a knife which had a six-inch blade. Wade then put the knife to her throat and asked her if she wanted to end up like Nicole Simpson. After Wade threw the knife so that it stuck in an opposing wall, Schulz tried to escape. However, she testified that Wade retrieved the knife and slashed all four of her car tires before she could leave. In their testimony, Officers Kellum and Kinlaw verified that the tires on Schulz's car were slashed with a knife-like instrument. A knife with a six-inch blade that is able to slash car tires is certainly capable of causing death or serious bodily injury when wielded within sufficient proximity to a person's throat. *See Herbert v. State,* 631 S.W.2d 585, 587 (Tex.App.—El Paso 1982, no pet.) (Knife that can cut through a material as tough as an orange rind is a deadly weapon when used against a person, even if the knife's blade never cut or touched the victim's throat.). When this testimony is viewed in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the knife used in this assault to be a deadly weapon. *Moore,* 935 S.W.2d at 126. We overrule Wade's fifth point.

■ Wade asserts in his sixth point that the trial court erred in failing to answer the jury's request for more information concerning the terms of community supervision. The punishment charge listed certain terms and conditions that could be imposed if Wade received community supervision. However, the charge noted that these terms and conditions were not limited to the ones listed. The jury sent notes to the court asking what the probation restrictions would be in this case, whether the court has a standard set of restrictions, and whether the jury has any input or control over the terms and conditions imposed. The court responded by telling the jury that it should not be concerned with matters which it was not called upon to decide. Although Wade failed to make any objections to the punishment charge, he now claims the failure to inform the jury of all the terms and conditions of community supervision was reversible error.

If the defendant is eligible for community supervision and the jury recommends it, the trial judge must place the defendant on community supervision. TEX. CODE CRIM. PROC. ANN. art. 42.12, § 4 (Vernon Supp. 1997). Nevertheless, the trial judge remains solely responsible for determining the terms and conditions of the defendant's community supervision. *Id.* art. 42.12, § 1. Although the jury has no authority to set the terms and conditions, it is helpful to enumerate in the court's charge the community supervision terms and conditions which the court may impose if community supervision is recommended by the jury. *Flores v. State,* 513 S.W.2d 66, 69 (Tex.Crim.App.1974); *McNamara v. State,* 900 S.W.2d 466, 467 (Tex. App.—Fort Worth 1995, no pet.); *Yarbrough v. State,* 742 S.W.2d 62, 64 (Tex.App.—Dallas 1987), *pet. dism'd, improvidently granted,* 779 S.W.2d 844 (Tex.Crim.App.1989). However, the failure to enumerate all of the terms and conditions is not considered harmful to the accused or restrictive of the court's authority. *Id.*

In this case, the court's charge explained community supervision and enumerated thirteen conditions that could be placed upon Wade if the jury recommended community supervision. Additionally, Wade's counsel was allowed to fully discuss the terms and conditions during closing argument. Thus, the jury had adequate instructions to render a proper verdict. The absence of a complete list of all the statutory terms and conditions of community supervision in the charge was not error. *McNamara,* 900 S.W.2d at 468. Wade's sixth point is overruled.

We affirm the judgment.