Alphonso NICKERSON, Jr., Appellant,

v.

The STATE of Texas, Appellee.

No. 10–99–089–CR.

Court of Appeals of Texas,
Waco.

Jan. 23, 2002.

**664**

Earl R. Waddell, Jr., Ft. Worth, for appellant.

Tim Curry, Tarrant County Crim. Dist. Atty., Charles M. Mallin, John Stride, Tarrant County Asst. Crim. Dist. Attys., Fort Worth, for appellee.

Before Chief Justice DAVIS, Justice VANCE, and Justice GRAY.

## OPINION

REX D. DAVIS, Chief Justice.

A jury convicted Alphonso Nickerson, Jr. of murder and two counts of aggravated sexual assault. The jury assessed his punishment at life imprisonment for the murder and ninety-nine years for each of the aggravated sexual assaults. Nickerson claims in four points that the evidence is legally insufficient to prove that: (1) he acted with intent to cause serious bodily injury; (2) he committed an act clearly dangerous to human life; (3) the victim was alive when he committed the alleged sexual assaults; and (4) he placed the victim in fear of death or serious bodily injury or threatened to cause death or serious bodily injury to her. He argues in his three remaining points that: (1) the evidence is legally and factually insufficient to prove that he used or exhibited a deadly weapon; (2) he has been convicted and punished twice for the same offense in violation of double jeopardy; and (3) the trial court abused its discretion by denying his motion for mistrial based on an alleged *Brady* violation.

## BACKGROUND

The offenses of which Nickerson was convicted all arise from the same transaction. The indictment alleges in pertinent part that Nickerson did:

with intent to cause serious bodily injury to Maxine Nash, commit an act clearly dangerous to human life by suffocating the said Maxine Nash with the weight of the body of the said defendant, which caused the death of Maxine Nash, and the said defendant did then and there use or exhibit a deadly weapon during the course of said suffocation, to—wit: the body of the defendant, that in the manner of its use or intended use was capable of causing death or serious bodily injury,

. . . .

... and ... did intentionally or knowingly cause the penetration of the female sexual organ of Maxine Nash by inserting his penis into the female sexual organ of Maxine Nash without the consent of Maxine Nash by compelling Maxine Nash to submit or participate by the use of physical force or violence and by threatening to use force or violence against Maxine Nash and Maxine Nash believed that the defendant had the present ability to execute said threat, and the defendant by acts or words placed Maxine Nash in fear that death or serious bodily injury would be imminently inflicted on Maxine Nash and the defendant by acts or words occurring in the presence of Maxine Nash threatened to cause the death of or serious bodily injury to Maxine Nash,

The third count of the indictment is virtually identical to the second except that it alleges as an aggravating circumstance that Nickerson "used or exhibited a deadly weapon, to-wit: a knife, that in the manner of its use or intended use was capable of causing death or serious bodily injury, in the course of the same criminal episode...."

According to the testimony, a neighbor saw Nash talking to Nickerson in her front yard at approximately 9:45 on the morning in question. Nash's twenty-one-year-old grandson Doug arrived at her house about fifteen minutes later. When Doug arrived, he found the residence locked. He heard no answer when he knocked, but he noticed Nash's car and Nickerson's truck in the driveway. As Doug walked around the house checking all the doors, he heard a voice from inside shouting, "I'm f——ing you, you curly-haired mother f——er. I'm f——ing you, I'm f——ing you, I'm f——ing you."

After trying again to gain the attention of someone inside by beating on the windows and door and after breaking a side window, Doug ran down the street seeking assistance.[1] He summoned an officer who happened to be driving in the neighborhood. When Doug returned with the officer to the residence, he heard the same shouting as before. The officer testified that he heard a television. At Doug's insistence, he "tried to listen to something in between the TV set, and [he] heard some moaning, but [he] couldn't—it was distorted, so [he] wasn't sure exactly what it was."

The officer radioed for assistance and told Doug that he would not enter the house until other officers arrived. When additional officers arrived, they debated whether to kick in the door. As they did so, Doug kicked in the door and rushed inside. Doug and the officers saw Nicker-

---

1. Doug explained that he initially intended to enter through the broken side window but then thought better of it.

son in a back room atop Nash's body which lay in a chair. The primary officer testified that he saw Nickerson engaged "in a sexual act" with her body. Nickerson did not acknowledge the officers' presence even after they twice announced themselves and directed him to get off of Nash's body. The three officers physically removed Nickerson and handcuffed him. According to the primary officer, Nickerson repeatedly stated, "I've got you, sap-sucking bitch, you. I've got you, sap-sucking bitch, you."[2] Nash was dead, and the primary officer "noticed that what appeared to be rigor mortis had set in."

A crime scene investigator noticed blood on the carpet beneath the chair in which Nash's body lay. Because he ran out of scalpel blades, he took a knife from the kitchen to finish removing a carpet square containing the blood stain. The kitchen knife had blood on it, but a forensic scientist testified that it would not be useful as evidence because of the likelihood that it had been contaminated when the investigator used it to remove the blood-stained carpet. The investigator found Nickerson's shorts in a bedroom. A pocket knife was found in the pocket of his shorts, but forensic testing revealed no blood on this knife.

An autopsy revealed that Nash suffered a blow to the head and other abrasions. She had a stab wound in the "perineal area" and two smaller lacerations to the right of this wound.[3] The medical examiner testified that this wound was consistent with that which would be caused by "a sharp instrument such as a knife." He opined that her cause of death was overly-

ing, which he defined as "the weight of a— of a body on top of another body that restricts respiratory movements."

## MURDER CONVICTION

In Nickerson's first point, he challenges the legal sufficiency of the evidence to establish that he intended to cause death or serious bodily injury to Nash. He contends in his second point that the evidence is legally insufficient to prove that he committed an act clearly dangerous to human life.

■ In reviewing a claim of legal insufficiency, we view the evidence in a light most favorable to the verdict and determine whether any rational trier of fact could have found the essential element beyond a reasonable doubt. *Lacour v. State*, 8 S.W.3d 670, 671 (Tex.Crim.App.2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979)). We resolve any inconsistencies in the evidence in favor of the verdict. *Matson v. State*, 819 S.W.2d 839, 843 (Tex. Crim.App.1991).

To obtain a conviction under the theory of murder alleged, the State had to prove that: (1) Nickerson committed an act with intent to cause serious bodily injury; (2) this act was "objectively clearly dangerous to human life"; and (3) this act caused Nash's death. *Lugo–Lugo v. State*, 650 S.W.2d 72, 81 (Tex.Crim.App.1983); *Jones v. State*, 716 S.W.2d 142, 155–56 (Tex.App.-Austin 1986, pet. ref'd). We examine first the sufficiency of the evidence to show that

---

**2.** Doug testified that Nickerson continued to mumble the obscenities he had heard earlier. Another officer testified that Nickerson was mumbling some combination of what Doug and the primary officer testified they heard. The witnesses all seem to agree that Nickerson appeared incoherent at this time.

**3.** The perineum is "the area between the anus and the posterior part of the external genitalia." MERRIAM WEBSTER'S COLLEGIATE DICTIONARY 864 (10th ed.1993).

Nickerson acted with the intent to cause serious bodily injury.

■ A jury may infer intent from the acts and words of the defendant, the manner in which the offense was committed, the nature of the wounds inflicted, and the relative size and strength of the parties. *See Patrick v. State,* 906 S.W.2d 481, 487 (Tex.Crim.App.1995); *West v. State,* 846 S.W.2d 912, 914 (Tex.App.-Beaumont 1993, pet. ref'd).

■ Based on the allegations of the indictment, the central issue is whether Nickerson intended to cause serious bodily injury to Nash when he exerted the weight of his own body against hers and suffocated her. The primary officer described Nickerson as nearly seven-feet tall and about 280 pounds. It took three officers to remove him from Nash's body. The State presented no definitive proof of Nash's height or weight. Nevertheless, crime scene photographs reflect that, though she would not be characterized as petite, she was significantly smaller than Nickerson.

The medical examiner described the wounds sustained by Nash. She suffered a stab wound in the perineum, a blow to the head, multiple contusions and abrasions, and a laceration to the inside of her upper lip. He testified that the lip injury would be consistent with someone pushing against her lips and teeth. Crime scene photographs reflect that Nash's body was positioned in a chair so that her neck was bent at nearly a ninety-degree angle during the assault. The medical examiner and the primary officer both testified that this position would have made it difficult for her to breath.

Given that the officers found Nickerson atop Nash's body, a rational jury could infer that he stabbed her before commencing the sexual assault. A rational jury could also infer that Nickerson covered Nash's mouth with his hand in an effort to suffocate her. Because of the stab wound, the lip injury noted, the other contusions and abrasions, Nickerson's size, and the position of Nash's body, a rational jury could infer that Nickerson intended to cause Nash serious bodily injury when he lay on her. Accordingly, we overrule Nickerson's first point.

■ Nickerson's second point questions the legal sufficiency of the evidence to prove that the exertion of his own body weight against Nash constitutes an act clearly dangerous to human life. He cites the history of the human sexual experience for the proposition that sexual intercourse between larger men and smaller women is not "objectively clearly dangerous to human life." *Lugo–Lugo,* 650 S.W.2d at 81; *Jones,* 716 S.W.2d at 155–56.

However, the medical examiner did not testify that Nickerson's actions were clearly dangerous to Nash merely because of his weight. Rather, he testified that Nickerson's conduct was clearly dangerous to human life because of the position in which Nash was situated in the chair. Thus, a rational juror could have concluded that Nickerson's exertion of his own weight upon Nash was "objectively clearly dangerous to human life" because her respiratory movement was already limited by her position in the chair. *See West,* 846 S.W.2d at 914–15 (evidence of slapping of 105 pound woman in the mouth by 200 pound "award-winning bodybuilder" sufficient to establish conduct "clearly dangerous to human life"). Thus, we overrule Nickerson's second point.

## AGGRAVATED SEXUAL ASSAULT CONVICTIONS

Nickerson contends in his third point that the evidence is legally insufficient to prove Nash was alive at the time of the alleged sexual assaults. He avers in his

fourth point that the evidence is legally insufficient to prove that he placed Nash in fear of imminent death or serious bodily injury or threatened to cause her death or serious bodily injury. He claims in his fifth point that the evidence is legally and factually insufficient to prove that he used or exhibited a knife in the commission of the second alleged sexual assault. He argues in his sixth point that he has been convicted and punished twice for the same offense, in violation of his double jeopardy rights.

■ The State concedes Nickerson's fifth and sixth points and asks that we vacate the second of the two aggravated sexual assault convictions. However, we are not bound by such concessions. *See Long v. State*, 931 S.W.2d 285, 289 (Tex. Crim.App.1996); *Rosalez v. State*, 875 S.W.2d 705, 712 n. 2 (Tex.App.-Dallas 1993, pet. ref'd).

### ORDER OF DISCUSSION

■ We initially must decide which issue must be addressed first. When legal and factual sufficiency challenges are raised, we address the legal sufficiency challenge first because an affirmative finding on that issue will result in rendition of a judgment of acquittal, while a finding of factual insufficiency results in a remand for a new trial. *See Clewis v. State*, 922 S.W.2d 126, 133–34 (Tex.Crim.App.1996); *Murphy v. State*, 4 S.W.3d 926, 928 (Tex. App.-Waco 1999, pet. ref'd); *see also Brown v. State*, 35 S.W.3d 183, 187 n. 2 (Tex.App.-Waco 2000, pet. granted). Somewhat like a finding of legal insufficiency, a finding of a double jeopardy violation will result in a judgment vacating one of the convictions. *See Landers v. State*, 957 S.W.2d 558, 559 (Tex.Crim.App. 1997).

Because a finding of legal insufficiency results in an affirmative judgment in the appellant's favor rather than vacation of the judgment against him, a successful legal sufficiency issue would provide somewhat greater relief to the appellant. *See Edmonson v. State*, 951 S.W.2d 6, 6 (Tex. Crim.App.1997) (per curiam); *Roberson v. State*, 810 S.W.2d 224, 224–25 (Tex.Crim. App.1991) (per curiam); *see also Bradleys' Elec., Inc. v. Cigna Lloyds Ins. Co.*, 995 S.W.2d 675, 677 (Tex.1999) ("appellate court should first address those points that would afford the party the greatest relief"). Accordingly, we address Nickerson's legal sufficiency claims first.

### LEGAL SUFFICIENCY

■ Nickerson claims in his third point that the evidence is legally insufficient to prove that Nash was alive when he sexually assaulted her. When asked how long it would take for suffocation by overlying to occur, the medical examiner testified:

It's difficult in exact terms. Various studies have indicated when you place a heavy weight and freeze the chest movements, in about 30—approximately 30 seconds, you get a slowing of the heart rate. And about a minute and a half out, you'll have complete—you'll have a flat line if you take an EKG. Flat line means the heart has quit beating.

Nickerson argues that there is no evidence that Nash was alive during this approximately 90 second period of time. However, the primary officer testified that he "heard some moaning" when he went around to the side of the house at Doug's insistence. Although the officer could not state with certainty what the source of this moaning was, it was clearly a distinct sound from the shouting heard by Doug and attributed to Nickerson. From this evidence, we conclude that a rational trier of fact could have found that Nash was alive when Nickerson sexually assaulted her. *See Santellan v. State*, 939 S.W.2d

155, 163 (Tex.Crim.App.1997). Accordingly, we overrule his third point.

Nickerson contends in his fourth point that the evidence is legally insufficient to prove that he placed Nash in fear of imminent death or serious bodily injury or threatened to cause her death or serious bodily injury. The State alleged each of these aggravating circumstances as alternative bases for conviction under the second count. Thus, legally sufficient proof of either will suffice to uphold the verdict. *See Lawton v. State*, 913 S.W.2d 542, 551 (Tex.Crim.App.1995); *Wesley v. State*, 997 S.W.2d 874, 876 (Tex.App.-Waco 1999, no pet.).

■ When the State alleges that a defendant's actions or words placed his victim in fear of imminent death or serious bodily injury:

> [t]he jury may consider the actor's objective conduct, his acts, words, or deeds and then infer from the totality of the circumstances whether or not his overall conduct placed the complainant in fear of serious bodily injury. It is ... not necessary to demonstrate that the accused could have inflicted serious bodily injury. It is not necessary that a threat or being placed in a state of fear be communicated verbally. Whether or not a victim was placed in fear of death or serious bodily injury is a fact to be determined by the jury.

*Ontiveros v. State*, 890 S.W.2d 919, 927 (Tex.App.-El Paso 1994, no pet.) (citations omitted); *accord Dalton v. State*, 898 S.W.2d 424, 429 (Tex.App.-Fort Worth 1995, pet. ref'd).

■ The record reflects that Nash suffered a blow to the head and a stab wound. Nickerson argues that there is no evidence that he is the person who inflicted these wounds. However, he is the last person with whom she was seen alive (and without these injuries), and the evidence clearly supports an inference that he remained with her continuously until her death about thirty minutes later. *See Rios v. State*, 846 S.W.2d 310, 314–15 (Tex.Crim.App.1992); *Amunson v. State*, 928 S.W.2d 601, 604 (Tex.App.-San Antonio 1996, pet. ref'd). Nash was suffocated by the weight of Nickerson's body over her own. The primary officer heard moaning. The medical examiner testified that Nash could have remained conscious for about ninety seconds after the brunt of Nickerson's weight came down upon her chest. Under the totality of these circumstances, we conclude that a rational jury could infer that Nickerson inflicted the injuries noted by the medical examiner and that Nickerson's conduct in inflicting these injuries and suffocating Nash placed her in fear of death or serious bodily injury. Accordingly, we overrule Nickerson's fourth point.

■ Nickerson avers in his fifth point that the evidence is legally insufficient to prove that he used or exhibited a deadly weapon. He relies primarily on the fact that the State failed to produce evidence that either of the knives recovered from the crime scene is the weapon used.

■ The medical examiner testified that Nash suffered "a four-inch deep stab wound" in the perineum. He opined that this wound was consistent with that which would be caused by "a sharp instrument such as a knife." This wound was not fatal however. The forensic scientist testified that the knife recovered from the kitchen had blood on it, though he did not connect it to Nash because the investigator had used it to remove the blood-stained carpet. However, the State need not produce a knife at trial to prove that it was used or exhibited as a deadly weapon. *See Morales v. State*, 633 S.W.2d 866, 868 (Tex.Crim.App. [Panel Op.] 1982); *Billey v. State*, 895 S.W.2d 417, 420 (Tex.App.-

Amarillo 1995, pet. ref'd); *Victor v. State,* 874 S.W.2d 748, 751 (Tex.App.-Houston [1st Dist.] 1994, pet. ref'd).

■ A deadly weapon is: "(A) a firearm or anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or (B) anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PEN.CODE ANN. § 1.07(a)(17) (Vernon 1994). Generally, a knife is not a deadly weapon by design. *See Thomas v. State,* 821 S.W.2d 616, 620 (Tex.Crim.App.1991); *Wade v. State,* 951 S.W.2d 886, 892 (Tex.App.-Waco 1997, pet. ref'd); *see also Davis v. State,* 22 S.W.3d 638, 641 (Tex.App.-Waco 2000, pet. ref'd). A knife can be a deadly weapon, however, if in the manner of its use or intended use it was capable of causing death or serious bodily injury. *See* TEX. PEN.CODE ANN. § 1.07(a)(17)(B); *Davis,* 22 S.W.3d at 641; *Garcia v. State,* 17 S.W.3d 1, 4 (Tex.App.-Houston [1st Dist.] 1999, pet. ref'd).

■ To determine whether a knife is a deadly weapon in the manner of its use or intended use, we examine the following factors:

- size, shape, and sharpness of the knife;
- manner of its use or intended use;
- nature or existence of inflicted wounds; and
- testimony of the knife's life-threatening capabilities.

*Thomas,* 821 S.W.2d at 619; *Davis,* 22 S.W.3d at 641; *Garcia,* 17 S.W.3d at 4.

Because the forensic scientist detected no blood on the Swiss Army knife recovered from the pocket of Nickerson's shorts, we focus on the kitchen knife. The

investigator described this knife as a "butcher-knife-type kni[fe]." Even though this knife was contaminated by its use to remove the blood-stained carpet, the jury could rationally infer that Nickerson stabbed Nash in the perineum with this knife. The medical examiner described Nash's four-inch wound as "painful" yet not fatal. She lost "about a hundred milliliters of blood" because of the wound.[4] The medical examiner opined that this wound "played a small part in [her death]."

Although the evidence is weak, we conclude that a rational trier of fact could have found that this knife was capable of causing death or serious bodily injury in the manner of its use or intended use. *Cf. Morales,* 633 S.W.2d at 868–69 (knife used to slash cheek); *Wade,* 951 S.W.2d at 893 (knife held to victim's throat). Thus, the evidence is legally sufficient to sustain the jury's finding that Nickerson used or exhibited a deadly weapon. Accordingly, we overrule Nickerson's fifth point in part.

### DOUBLE JEOPARDY

■ Nickerson claims in his sixth point that he has been convicted and punished twice for the same offense, in violation of his double jeopardy rights. Double jeopardy prohibits: (1) a subsequent prosecution for the same offense after acquittal; (2) a subsequent prosecution for the same offense after conviction; and (3) multiple punishments for the same offense. *See Monge v. California,* 524 U.S. 721, 727–28, 118 S.Ct. 2246, 2250, 141 L.Ed.2d 615, 623 (1998) (citing *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656, 664–65 (1969)). Nickerson's claim falls within the multiple

---

**4.** The medical examiner explained that 100 milliliters would be "[a]bout half a coffee cup full."

punishments prohibition.[5] *See Gonzalez v. State,* 8 S.W.3d 640, 640–41 (Tex.Crim. App.2000).

█ The jury convicted Nickerson of two aggravated sexual assault offenses which vary only in terms of that which makes each an aggravated offense. To determine whether offenses are the same for jeopardy purposes, we must construe the statutory provisions in question to discern "the 'allowable unit of prosecution,' which is 'a distinguishable discrete act that is a separate violation of the statute.'" *Ex parte Hawkins,* 6 S.W.3d 554, 556 (Tex. Crim.App.1999) (quoting *Sanabria v. United States,* 437 U.S. 54, 69–70 & n. 24, 98 S.Ct. 2170, 2181–82 & n. 24, 57 L.Ed.2d 43, 57 (1978)).[6]

█ Section 22.021(a)(1)(A) of the Penal Code proscribes three discrete acts which constitute the allowable units of prosecution in a case in which the victim is an adult. *See* Tex. Pen.Code Ann. § 22.021(a)(1)(A) (Vernon Supp.2002); *see also Vick v. State,* 991 S.W.2d 830, 832–33 (Tex.Crim.App.1999) (construing section 22.021(a)(1)(B) as providing five distinct offenses for jeopardy purposes). In Nickerson's case, the only distinction between the two counts of aggravated sexual assault alleged are the aggravating circumstances. Both counts rely on the definition of sexual assault found in section 22.021(a)(1)(A)(i). The record contains no evidence that Nickerson twice assaulted Nash in this manner. Accordingly, we conclude that his conviction and punishment for one of these offenses is jeopardy-barred.

█ Ordinarily in such a case, we must impose the conviction for the "most serious offense" or that for which Nickerson received the "most serious punishment" and vacate the other conviction. *See Harris v. State,* 34 S.W.3d 609, 612–13 (Tex.App.-Waco 2000, pet. ref'd) (citing *Landers,* 957 S.W.2d at 559–60; *Ex parte Pena,* 820 S.W.2d 806, 809 (Tex.Crim.App. 1991)). However, the offenses for which Nickerson was convicted are identical, and the punishment assessed in each case is likewise identical. Accordingly, we will "uphold the conviction listed first in the trial court's judgment." *Id.* at 614 (citing *Holcomb v. State,* 745 S.W.2d 903, 908 (Tex.Crim.App.1988)).

The judgment tracks the indictment. Thus, the first aggravated sexual assault listed in the judgment is that in which Nickerson placed Nash in fear of imminent death or serious bodily injury, the offense alleged in count two. Accordingly, we will vacate the conviction and punishment for the offense alleged in count three (aggravated sexual assault by use or exhibition of a deadly weapon). *Id.*

For the reasons stated, we sustain Nickerson's sixth point. In view of our disposition of Nickerson's sixth point, we need not address the remainder of his fifth point which challenges the factual sufficiency of

---

**5.** Although it is true that Nickerson also claims he has been improperly convicted twice for the same offense, he was placed in "jeopardy" only once (*i.e.,* when the jury was empaneled and sworn). *See Crist v. Bretz,* 437 U.S. 28, 38, 98 S.Ct. 2156, 2162, 57 L.Ed.2d 24, 33 (1978); *Ex parte Ward,* 964 S.W.2d 617, 631 n. 18 (Tex.Crim.App.1998). Thus, when an appellant contends that he has been convicted and punished for the same offense twice in a single proceeding, his claim arises under the multiple punishments prohibition. *See, e.g., Gonzalez v. State,* 8 S.W.3d 640, 640–41 (Tex.Crim.App.2000).

**6.** Apparently, the term "allowable unit of prosecution" originated in *United States v. Universal C.I.T. Credit Corp.,* 344 U.S. 218, 221, 73 S.Ct. 227, 229, 97 L.Ed. 260, 264 (1952).

the evidence to show that he used or exhibited a deadly weapon.

## BRADY EVIDENCE

Nickerson argues in his seventh point that the court abused its discretion by overruling his motion for mistrial premised on an alleged *Brady* violation. This point relates to the State's disclosure during the punishment phase of a videotape depicting an episode in the county jail in which Nickerson engaged in aberrant behavior. The State responds that the videotape does not constitute *Brady* evidence because it could have been independently obtained by defense counsel through the exercise of reasonable diligence and because Nickerson himself knew he had engaged in the behavior depicted therein and that the incident was videotaped. The State contends that the videotape is not material because Nickerson's expert did not testify with certainty that he had changed his opinion regarding Nickerson's sanity after a review of the videotape.

### APPLICABLE LAW

■ "A prosecutor has an affirmative duty to turn over material, favorable evidence to the defense." *Little v. State,* 991 S.W.2d 864, 866 (Tex.Crim.App.1999) (citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *McFarland v. State,* 928 S.W.2d 482, 511 (Tex. Crim.App.1996)). The prosecutor's failure to turn over such evidence to the defense constitutes a violation of due process. *See id.*

Favorable evidence is any evidence that, if disclosed and used effectively, may make the difference between conviction and acquittal. It includes both exculpatory and impeachment evidence. Exculpatory evidence is testimony or other evidence which tends to justify, excuse or clear the defendant from alleged fault or guilt. Impeachment evidence is that which is offered to dispute, disparage, deny, or contradict.

*Id.* at 866–67 (citing *United States v. Bagley,* 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481, 490 (1985); *Thomas v. State,* 841 S.W.2d 399, 404 (Tex.Crim.App. 1992)) (footnotes omitted).

■ Evidence is considered material for *Brady* purposes when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 866 (citing *Kyles v. Whitley,* 514 U.S. 419, 434, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490, 506 (1995); *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; *Ex parte Kimes,* 872 S.W.2d 700, 702–03 (Tex.Crim.App.1993)). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome of the trial." [7] *Kimes,* 872 S.W.2d at 702 (citing *Bagley,* 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494); *Ealoms v. State,* 983 S.W.2d 853, 859 (Tex.App.-Waco 1998, pet. ref'd); *accord Lagrone v. State,* 942 S.W.2d 602, 615 (Tex.Crim.App.1997).

■ A prosecutor has no duty to provide evidence not in the possession of the State or not known to exist. *See Hafdahl v. State,* 805 S.W.2d 396, 399 n. 3 (Tex. Crim.App.1990); *State v. Blanco,* 953 S.W.2d 799, 802–03 (Tex.App.-Corpus Christi 1997, pet. ref'd). However, the prosecutor has an affirmative duty to learn of material, favorable evidence known to others acting on behalf of the State, such

---

7. This test finds its origin in the *Strickland v. Washington* test for prejudice in ineffective assistance of counsel claims. *See United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481, 494 (1985) (quoting *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674, 698 (1984)).

as law enforcement and correctional officials, and turn over that evidence to the defense. *See Kyles,* 514 U.S. at 437, 115 S.Ct. at 1567, 131 L.Ed.2d at 508; *Ex parte Mitchell,* 977 S.W.2d 575, 578 (Tex. Crim.App.1997).

■ Conversely, the State has no duty to disclose matters of public record "if defense counsel should know of them and fails to obtain [them] because of a lack of diligence in his own investigation." *Dalbosco v. State,* 960 S.W.2d 901, 903 (Tex. App.-Texarkana 1997, order), *disp. on merits,* 978 S.W.2d 236 (Tex.App.-Texarkana 1998, pet. ref'd). "The necessary inquiry is whether [defense counsel] knew or should have known facts that would have allowed him to access the undisclosed evidence." *Id.* (citing *United States v. Payne,* 63 F.3d 1200, 1208 (2nd Cir.1995)).

### PERTINENT FACTS

The offense occurred on June 4, 1997. Nickerson's counsel made a written request for *Brady* evidence along with other standard pre-trial motions on July 23, 1998. Contemporaneously, counsel filed written notice of his intent to employ the insanity defense.[8] Counsel filed a motion for a sanity examination three months later. The court granted the motion and appointed a psychiatrist, Dr. James Shupe, to examine Nickerson and evaluate his sanity. The State filed a motion for an independent sanity examination in February 1999. The court granted this request and appointed a psychologist, Dr. George Mount, to conduct this examination. Dr. Mount filed his report with the court one week before trial, concluding that Nickerson was sane at the time of the offense.[9]

At a pretrial hearing held one week before trial, it was determined that Dr. Shupe had not yet prepared a report.[10] Accordingly, the court agreed to have a second psychiatrist, Dr. Mary Cannon, evaluate Nickerson should Dr. Shupe not provide the results of his evaluation by that afternoon. Dr. Shupe apparently did contact counsel because he provided testimony on this issue at trial in a hearing outside the presence of the jury.

Nickerson's counsel did not pursue an insanity defense at trial. During the first day of the punishment phase (March 25), the prosecutor apparently gave Nickerson's counsel access to a series of videotapes depicting Nickerson's behavior at jail and made counsel aware of at least one episode during which Nickerson engaged in aberrant behavior. The precise timing of these disclosures is not entirely clear from the record. Nickerson's counsel filed a motion on the first day of the punish-

8. The court *sua sponte* ordered a competency examination on June 13, 1997, shortly after Nickerson's arrest. *See* TEX.CODE CRIM. PROC. ANN. ART. 46.02, § 3(a) (Vernon Supp.2002). However, no report or testimony appears in the record from the doctor appointed to conduct this examination. The court appointed counsel to represent Nickerson on June 13 as well. Nickerson's family retained counsel to represent him in October 1997. However, this retained attorney withdrew in April 1998 after Nickerson's family determined they could no longer afford his services.

9. Dr. Mount also concluded that Nickerson had "a factual understanding of the proceedings against him and the ability to consult with his lawyers with a reasonable degree of rational understanding." These are competency findings. *See* TEX.CODE CRIM. PROC. ANN. ART. 46.02, § 1A(a) (Vernon Supp.2002). However, competency findings should be set forth in a separate report. *Id.* art. 46.03, § 3(g) (Vernon 1979).

10. Article 46.03, § 3(d) of the Code of Criminal Procedure requires an expert appointed to conduct a sanity evaluation to submit his report to the court within 30 days after the order requiring the examination. *See* TEX. CODE CRIM. PROC. ANN. ART. 46.03, § 3(d) (Vernon Supp.2002).

ment phase requesting the appointment of Dr. Cannon to evaluate Nickerson's competency to stand trial because of a "psychotic episode in jail." The court directed Dr. Cannon to conduct her evaluation at noon on that same date. Dr. Cannon testified briefly that afternoon outside the presence of the jury and informed the court of her belief that Nickerson was competent.[11]

During further hearings on the matter the following day, counsel for the State informed the court that he did not come into possession of the videotape in question until the previous day.[12] Counsel further stated, "I called [defense counsel] up in the courtroom yesterday. Me and [defense counsel] viewed the tape at my residence last night." Nickerson's counsel confirmed the accuracy of this recitation.

The videotape depicts Nickerson in a jail cell on January 8, 1999.[13] A deputy appears at the beginning of the tape explaining that Nickerson had covered the floor of his cell with water and removed his clothes. The videotape depicts Nickerson and his cell from 5:11 to 5:42 that morning. During the entire episode, Nickerson is constantly rambling, making incoherent statements. At the beginning, he is standing at the door to his cell. Fifteen minutes later, an officer sprays him with pepper spray. Nickerson reacts to this and moves away from the cell door. However, he continues the incoherent rambling while laying down

and rolling around on the floor. At 5:39, an officer again sprays him with pepper spray with no discernible effect. The videotape ends two minutes later.

Nickerson's counsel presented the videotape to Drs. Shupe and Cannon for their review on the morning of March 26. The court conducted a hearing that morning outside the presence of the jury on the issue of the videotape and Nickerson's sanity. Dr. Shupe testified that he examined Nickerson in accordance with the court's November 1998 order. He concluded following that evaluation that Nickerson suffers from bipolar disorder but was sane at the time he committed the offense in June 1997.[14] After reviewing the January 1999 videotape however, Dr. Shupe testified that his opinion regarding Nickerson's sanity was "very clouded."

> I think it's very possible he was insane; I think it's possible he was sane. I think that I would need to go and talk with him more about the evidence I viewed this morning and, in context of that, go back over what happened the day of the alleged offense.

Dr. Shupe testified that he is no longer certain that his initial diagnosis is reliable. To reach a more certain conclusion, he explained that he would need to review the videotape again, determine whether Nickerson had engaged in similar behavior on other occasions while in the jail, interview

---

11. Dr. Cannon was Nickerson's only punishment witness that afternoon. The jury returned from its lunch recess at 1:29. The court received Dr. Cannon's testimony outside the presence of the jury. The court then discharged the jury at 1:36 and directed the jurors to report back at 9:00 the next morning.

12. The record contains no evidence of when counsel for the State first learned of the existence of this specific videotape. However, the State applied for a subpoena on January 25, 1999 directing the custodian of records for

the county jail to provide instanter "[a]ll written jail records" and "[a]ll videotapes containing images of [Nickerson]." The district clerk issued a subpoena to this effect the next day.

13. We directed the district clerk to provide us with this original exhibit pursuant to the State's motion. *See* TEX.R.APP. P. 34.6(g)(2).

14. The experts all seem to agree that Nickerson suffers from bipolar disorder.

witnesses to the event in question, and discuss the incident with Nickerson. He concluded that a "definite possibility" exists with the revelation of the videotape that upon such further review he would determine that Nickerson was insane at the time of the offense.

On cross-examination, Dr. Shupe agreed that inmates sometimes dampen the floor of their cells and "roll around in the water" as Nickerson did to make themselves slippery and harder for correctional officers to grasp. He agreed that an inmate hypothetically might also do so to alleviate the effects of pepper spray. He has witnessed instances in the past in which inmates have become "more bizarre" as their trial date approached.

Nickerson's counsel next called Dr. Cannon to testify. She characterized Nickerson's January 8 behavior as "psychotic." Based on her evaluation of Nickerson the day before, her review of the circumstances of the offense, and the videotape of the January 8 incident, she opined that "a very good probability" exists that Nickerson was insane at the time of the offense. Dr. Cannon based this opinion on: (1) the fact that Nickerson was competent a day earlier yet had been "psychotic" during the January 8 incident, indicating that "he can be in and out of psychosis"; and (2) the fact that three officers had to remove Nickerson from Nash's body.[15]

On cross-examination, she testified consistently with Dr. Shupe that inmates frequently engage in more erratic behavior as their trial date approaches and that "rolling in the water" would alleviate the symptoms of pepper spray.

The State's first witness on this issue was Dr. Arthur Kranz, a psychiatrist who works for the Tarrant County MHMR in the county jail. Dr. Kranz evaluated Nickerson on January 12 and again on March 25.[16] He confirmed that inmates frequently engage in more bizarre behavior as their trial date nears. According to Dr. Kranz, Nickerson "was just decompensating under the pressure" of his approaching trial and because he was experiencing "very strong conflict" due to the occurrence of "homosexual behavior and aberrant sexual behavior" in the jail "which he could not tolerate . . . because of his very strong religious beliefs."

Dr. Kranz testified that inmates commonly use soap and water to make their cells slippery. Inmates frequently remove their clothing in this situation to make themselves more difficult and more odious for correctional officers to grasp. According to Dr. Kranz, Nickerson is a former jailer and is aware of this commonly employed tactic. On cross-examination, Dr. Kranz discounted the videotape of the January 8 incident as "immaterial" to the issue of whether Nickerson was sane in June 1997.

The State concluded its evidence in this hearing with the testimony of Dr. Mount. Dr. Mount testified that his February 1999 evaluation of Nickerson led him to con-

---

**15.** Regarding this second factor, Dr. Cannon recounted her thirty years' experience in which she has on several occasions conducted psychiatric evaluations of alleged rapists, "a few [of whom] have been caught in the act." She testified:

I do not recall a single one where the rape was not stopped upon the appearance of other people, and I think it is just—I believe it was psychotic to continue something that is

so obviously wrong and so obviously against the law in the presence of officers.

You know, he's just crazy.

**16.** Apparently, the jail staff asked Dr. Kranz to evaluate Nickerson after the January 8 incident. Dr. Kranz's testimony suggests that he reviewed the videotape of this incident as a part of his January 12 evaluation of Nickerson.

clude that Nickerson was sane at the time of the offense. Dr. Mount opined that Nickerson may have been malingering during the January 8 incident. However, Drs. Shupe, Cannon, and Kranz all testified that they did not believe he was malingering.

### ANALYSIS

We first examine whether the videotape constitutes material evidence. To be material, there must be "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; *Little*, 991 S.W.2d at 866. "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; *Kimes*, 872 S.W.2d at 702; *Ealoms*, 983 S.W.2d at 859.

Drs. Shupe and Cannon both expressed strong reservations about their initial sanity diagnoses after their review of the videotape at issue. This suffices to undermine confidence in the outcome of Nickerson's trial. Accordingly, we conclude that the videotape is material.

The State does not question that the videotape is "favorable" to Nickerson's insanity defense. *See Bagley*, 473 U.S. at 676, 105 S.Ct. at 3380, 87 L.Ed.2d at 490; *Little*, 991 S.W.2d at 866. Nor does the State dispute that this evidence was in the possession of agents acting on behalf of the State. *See Kyles*, 514 U.S. at 437, 115 S.Ct. at 1567, 131 L.Ed.2d at 508; *Mitchell*, 977 S.W.2d at 578. Thus, the prosecution had an affirmative duty to timely disclose the existence of the videotape to defense counsel unless counsel should have known the videotape existed and failed to obtain it because of counsel's own lack of diligence. *See Dalbosco*, 960 S.W.2d at 903.

"So far as a *Brady* inquiry is concerned, then, the relevant question is whether [defense counsel] should have known that [the January 8 episode had occurred]." *Id.* Given the uncertainty regarding Nickerson's sanity, Nickerson's "knowledge" of the event has no bearing on what his attorney should have known. Thus, we cannot say that counsel should have known that the incident had occurred. *See Dalbosco*, 978 S.W.2d at 238 (op. on merits).

For the reasons stated, we sustain Nickerson's seventh point.

### CONCLUSION

We have determined that the evidence is legally sufficient to support Nickerson's convictions. However, his conviction and punishment for the offense alleged in count three of the indictment (aggravated sexual assault by use or exhibition of a deadly weapon) is jeopardy-barred. Accordingly, we vacate this conviction.

Because the State failed to timely disclose the videotape of the January 8 incident, we reverse the judgment and remand this cause for a new trial on counts one and two (murder and aggravated sexual assault by threat).