# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-08-00315-CR

**Glenn Ray Allen, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 331ST JUDICIAL DISTRICT
NO. D-1-DC-06-302224, HONORABLE BOB PERKINS, JUDGE PRESIDING**

## M E M O R A N D U M  O P I N I O N

A jury found appellant Glenn Ray Allen guilty of seven counts of aggravated sexual assault. *See* Tex. Penal Code Ann. § 22.021 (West Supp. 2008). The jury assessed punishment at seventy-five years' imprisonment on two of the counts and at life imprisonment on the other five counts. In a single point of error, appellant contends that his trial counsel rendered ineffective assistance by inducing him to stipulate that he sexually assaulted the complaining witness. Although the State denies that appellant's trial counsel was ineffective, it does draw our attention to a double jeopardy violation. Because we find that appellant received multiple punishments for the same offenses, we reverse the judgments of conviction on four of the seven counts. Because we find that appellant was not prejudiced by the alleged ineffectiveness of his trial counsel, we affirm the remaining convictions.

## BACKGROUND

### *The Charged Offense*

Janet Smith,[1] together with her husband and a friend, spent the evening of September 2, 2006, moving into a new residence in South Austin. After a few hours, they stopped working and relaxed, drinking tequila shots and listening to music. Smith acknowledged that she became highly intoxicated. In the course of the evening, Smith and her husband began to argue. Some time after midnight, and despite her husband's efforts to stop her, Smith left her new residence, walked a half-block, and sat down on the curb.

Smith recalled noticing a vehicle drive past her, then stop and return to where she was sitting. Her next memory was being inside this vehicle as it drove through South Austin. She described the interior of the vehicle as "dark and trashy," with wires hanging out of the dashboard and a dog in the back seat. The driver of the vehicle, a stranger to Smith, was also unkempt, with "straggly hair." Smith would later tell the police that she believed that the vehicle in question was a Jeep Cherokee.

Frightened by her situation, Smith asked the man to drive her to an apartment complex where an acquaintance lived. He agreed to do this, but as they neared the complex, he produced a pistol and put it against Smith's head. The man demanded that Smith perform oral sex and threatened to kill her if she refused. Smith complied with this demand, but as she did so, she

---

[1] "Janet Smith" is a pseudonym chosen by the complainant. *See* Tex. Code Crim. Proc. Ann. art. 57.02 (West Supp. 2008).

felt for the passenger door handle. When she found the handle, she opened the door and jumped from the Jeep while it was still moving.

Smith found herself in an open field. Her assailant stopped his vehicle and pursued Smith on foot. He seized her, and they began to struggle. As the man hit her, Smith raised her hand to ward off his blows. Smith felt a cut on her hand and realized that the man had a knife. The attacker held Smith by her hair and put the knife to her neck. He threatened to slit her throat if she did not return to his vehicle. Bleeding from the cut on her hand, Smith returned to the Jeep, where the man handcuffed her to the gear shift lever.

The assailant drove to a wooded location, stopped, and ordered Smith out of the vehicle. He pushed her to the ground, removed her clothes, and penetrated her with his tongue and then with his penis. As he sexually assaulted her, the man twice choked Smith until she lost consciousness. When she returned to consciousness the second time, he helped Smith get dressed and returned her to his vehicle, where she was again handcuffed to the gear shift lever.

As the man drove back into Austin, he told Smith that he was going to take her "to a safe place where [she] wasn't going to give him 30 years." Smith testified that she believed that he intended to kill her, and she decided that her only hope was to convince him that she was his friend. To this end, Smith told the man that there had been "no crime." Hoping to lure him into a familiar neighborhood, Smith told the man that she knew of a vacant house (the house where she and her husband had been living) where they could stay until morning. She suggested that they could have breakfast and "be together forever."

3

At some point, the man removed the handcuffs. He also agreed to buy Smith some cigarettes, and he stopped at a convenience store at the corner of Ben White and South First. To convince him that she would not flee, Smith took off her shirt and told him she "wouldn't run being half clothed." When the man walked into the store, however, Smith left the Jeep and ran screaming to another vehicle that had just entered the parking lot.

The driver of this vehicle was Matthew Mock. Mock testified that he had stopped to buy gas when a woman he identified as Smith, naked from the waist up, ran to his car, screaming, crying, and begging for help. Mock said that Smith "looked like she had been put through the mill." She was "just bloody" and "looked horrible." He noticed specifically that she was bleeding from her hand. Mock allowed Smith to enter his car, and she climbed into the passenger floorboard. Smith "was just hunched up like she was trying to hide underneath [the] seat if she could have, like she would have absolutely crawled underneath there." Smith told Mock that she had been raped. She "was screaming that [the rapist] had a gun and a knife" and was inside the store. Mock did not look for the man because "[t]he reaction that she had was more than sufficient to scare me enough to get . . . both of us out of there." Mock, who had called 911 when he first saw Smith, drove across Ben White to a closed store, where he circled the parking lot "keeping an eye out for anybody else who might be coming after us" until help arrived.

Mock's 911 call was received at 3:30 a.m. Within minutes, both emergency medical personnel and police arrived at the scene. A paramedic described finding Smith "curled down in front of the seat of [Mock's] car almost in a fetal position, and she was holding her hands like this (indicating) and was crying and very, very—acting fearful." Smith was taken to the hospital, where

4

she received stitches in her hand and was examined by a sexual abuse nurse examiner. Semen collected during this examination was later found to contain appellant's DNA.

On October 4, 2006, appellant was stopped and arrested while driving a Jeep Cherokee. The interior of appellant's Jeep was dirty and wires were hanging from the dashboard. Two knives and a set of handcuffs were found inside the Jeep, and there were scratch marks on the gear shift lever. Appellant's booking photograph was placed in a photo spread and identified by Smith, who also identified appellant at the trial. Smith's DNA was not found on the knives or the handcuffs, but her DNA was found in blood stains on the Jeep's passenger seat.

### The Extraneous Offense and Appellant's Stipulation

Appellant was indicted on twelve counts of aggravated sexual assault. Appellant's trial strategy was to challenge Smith's credibility, particularly as it related to the aggravating elements. During jury selection, defense counsel told the panelists, "Intercourse, in this case, is not an issue. There is no question that sex occurred." He went on, "What I would like to concentrate on in this case is the issues regarding consent and the issues regarding whether the aggravated part—whether there was a weapon, whether there was a threat of a deadly weapon." Counsel returned to this theme in his opening statement at trial, saying, "Identity is not an issue. Intercourse is not an issue in this case. There is no question they had sex. That is not an issue." Instead, counsel suggested to the jury that Smith's account of events was not accurate, at least in part because of her intoxication.

Thereafter, by his cross-examination of the State's witnesses and through appellant's own witnesses, counsel adduced testimony regarding inconsistencies in Smith's statements to the

police and others regarding the events of the night in question. Counsel also sought to emphasize that the pistol allegedly used by appellant was never found and that Smith's DNA was not found on the handcuffs or the knives seized from appellant's vehicle. In addition, a defense expert testified that appellant's DNA was not found in the scrapings from under Smith's fingernails. The defense suggested that Smith's injuries could have been sustained during her argument with her husband, or when she fell or jumped from appellant's vehicle while intoxicated.

In effect, the defense sought to raise doubts in the jurors' minds regarding two elements of the charged offenses. First, the defense implicitly challenged whether appellant's admitted sexual activity had been without Smith's consent, that is, whether there had been a sexual assault at all. Second, the defense sought to persuade the jury that even if appellant had sexually assaulted Smith, the assaults had not been aggravated by threats of death or serious bodily injury or by the use of deadly weapons as alleged in the indictment.

After the defense rested at the guilt/innocence stage, the State announced that it intended to call M.M. as a rebuttal witness. In a proffer outside the jury's presence, M.M. testified that at 4:00 a.m. on September 10, 2006, one week after the alleged assaults on Smith, she had parked at her South Austin apartment complex and opened her car door when a man wedged himself into the opening and pointed a pistol at her face. The man told her that if she made a sound, he would kill her. M.M. said that she offered the man her purse and the keys to her car, but he refused them and told her "It's time to go." He then seized her arm and led her to a Jeep Cherokee. The man sat M.M. in the passenger seat and told her to put her head in her lap. He then began "messing with some wires" hanging from the dashboard. M.M. opened the door of the Jeep and, pulling away from

6

appellant's grasp, began to run "as fast as [she] could screaming at the top of [her] lungs." M.M. identified appellant as the man who assaulted and attempted to abduct her.

The State told the court that it was offering M.M.'s testimony "to rebut the theory that this was consensual sex, that there was no force used in the offense, and there was no abduction in the case in chief. So it is to rebut the defensive theories that came out." Defense counsel argued that because there had been no sexual assault committed or attempted against M.M., the extraneous offense had no relevance other than to prove appellant's bad character. *See* Tex. R. Evid. 404(b). The trial court was not persuaded by this argument, observing that because appellant had refused to take M.M.'s purse or car, "any reasonable observer . . . would have to infer . . . that a sexual assault was about to occur. I mean, there is nothing left." Ultimately, the court overruled appellant's rule 404(b) objection, concluding that M.M.'s testimony was admissible to rebut the defense's claim that "[Smith] gave consent to the defendant . . . and that her injuries occurred because of other things . . . ." The court also concluded that the charged offense and the attack on M.M. showed a similar modus operandi, noting that both incidents occurred in South Austin in the early morning hours and involved a woman who was alone, the same Jeep Cherokee was used in both incidents, and the attacker in both incidents was armed with a gun.

While the parties and the court were discussing the admissibility of M.M.'s testimony, one of appellant's attorneys, Brian Guerra, asked the court, "Judge, . . . if we do withdraw our theory of consent in this case, would that affect the Court's ruling?" The court responded, "If you-all are changing that position and you want to stipulate in front of the jury that she did not consent, then I think that does remove, you know, his intent as being an issue." One of the prosecutors interjected

7

that M.M.'s testimony was not only relevant to the issue of consent or intent, but also to rebut the defensive theory that appellant did not use a deadly weapon. At this point, the subject of the discussion changed to appellant's objection that M.M.'s testimony was unfairly prejudicial. *See* Tex. R. Evid. 403.

After the court overruled appellant's rule 403 objection, there was a discussion off the record. Then, the jurors were seated and the following written stipulation, State's exhibit 140, was read to them:

> I, Glenn Allen, the Defendant herein, judicially admit and stipulate that Janet Smith did not consent to having sex with me as alleged in count 1, 2, 5, 6, 7, 9, 11, and 12.

The stipulation was signed by appellant, his lead counsel, John Kuhn, and the State's lead counsel. With that, both sides closed. M.M. did not testify at the guilt/innocence stage.

During the charge conference, defense counsel asked for an instruction on the lesser included offense of sexual assault with respect to each count submitted to the jury. In each instance, counsel argued that Smith's credibility was in issue and the jury might disbelieve her testimony regarding appellant's threats and use of deadly weapons. The court refused the requested instructions because there was no evidence that appellant had not threatened or placed Smith in fear of death or serious bodily injury or that he had not used or exhibited a deadly weapon as alleged in the various counts. The court observed that if the jury disbelieved Smith's testimony regarding the aggravating conduct, the proper verdict was to find appellant not guilty. *See Hampton v. State*, 109 S.W.3d 437, 440 (Tex. Crim. App. 2003) (holding defendant not entitled to lesser included

offense instruction simply because jury might disbelieve crucial evidence pertaining to greater offense).

During his jury argument, defense counsel addressed the stipulation in this way:

When we sit there and talk about nonconsensual sex, there is a definition, and I would like you-all to read that carefully.[2] That is what Glenn is saying happened. That is what he is saying in this charge and in this stipulation that happened; that there was force used; it was nonconsensual; yes, he took advantage of a drunk woman. That's it.

Counsel went on to question the credibility of Smith's testimony regarding the circumstances of the assaults, with particular reference to the alleged aggravating elements. Counsel concluded:

As I told you back on voir dire, this is not a question of whether Glenn is all innocent. We admitted that it was nonconsensual sex. But the State has charged him with aggravated sexual assault. They had an opportunity. They could have charged him with sexual assault, but they chose not to. They did not give you that opportunity.

They are going for all the apples, all the bet. They want the gold ring or nothing at all. But that does not keep you from your duties of trying to say, well, he admitted sexual assault, nonconsensual taking advantage of this drunk woman, but that doesn't relieve you of your duties as to her credibility, as to these weapons, as to her representations that she was scared . . . .

The court's charge authorized the jury to convict appellant on eight of the twelve counts of aggravated sexual assault alleged in the indictment. The jury returned verdicts convicting appellant on seven of the eight counts and acquitting him on the remaining count.

---

2 Counsel was referring to the court's instruction regarding consent, or the lack thereof, taken from penal code section 22.011. *See* Tex. Penal Code Ann. § 22.011(b)(1), (2), (7) (West Supp. 2008).

### *Motion for New Trial*

Appellant retained new counsel following his conviction, who filed a motion for new trial urging that appellant's trial counsel rendered ineffective assistance. Among other things, the motion complained that trial counsel had induced appellant to stipulate that the alleged sexual conduct was nonconsensual by telling him that the maximum possible sentence would be reduced from life to twenty years.[3] Attached to the motion were affidavits from appellant, his mother, and Kuhn.

In his affidavit, appellant stated:

> Near the end of the trial, Mr. Kuhn met with me and my mother, Rosemary Follis. Mr. Kuhn told me that the judge was trying to help me, and I needed to sign a "stipulation." He said that if I signed it, my punishment would be between two and twenty years, that the charges would not be aggravated, and that if I got twenty years, I would be out in seven. He also told me we could still win the case even if I signed.
>
> . . .
>
> . . . I would not have signed it if I had known that my punishment could still be five to ninety-nine years, instead of what Mr. Kuhn told me. I was relying on Mr. Kuhn's advice.

Follis's affidavit was to the same effect. She stated that Guerra told her and appellant that "due to how the law was written, that if Glenn signed this, the punishment would be between two and twenty years. If he didn't sign it, he would get five to ninety-nine, but in his case he was sure to get ninety-nine." According to Follis's affidavit, Kuhn told her that "we had nothing to lose

---

[3] Appellant does not bring forward the other allegations in the motion for new trial.

and everything to gain by Glenn signing this document because . . . Glenn could be charged with only the lesser of all the counts if he signed the stipulation."

Kuhn's affidavit stated:

> In the midst of that hearing [regarding the admissibility of M.M.'s testimony], the Court . . . suggested that if Defendant were stipulating that he had committed non-consensual sex as to all counts in the indictment that the extraneous offense would not be allowed in. Off the record the conversation had with the Court was that Defense was negotiating with the Court and based on those conversations . . . this counsel and Defendant's mother [believed] that the Court would include a lesser included charge of sexual assault by Defendant entering into this agreement to stipulate . . . . [T]his counsel met with . . . Glenn Ray Allen and his mother, and represented to him the terms of the agreement as I understood them to be. But for that representation, Glenn Allen would not have signed the stipulation. . . .

Kuhn testified at the hearing on the motion for new trial and reaffirmed the statements quoted above. Kuhn said that he told appellant that by signing the stipulation, he would be foregoing one of his defenses—consent—but would receive two benefits: M.M.'s testimony would not be admitted at the guilt stage and the court would instruct the jury on the lesser included offense of sexual assault. Kuhn acknowledged that his advice to appellant regarding the lesser included offense charge was erroneous and said that it was based on a misunderstanding of his agreement with the trial court. Appellant's other trial counsel, Guerra, testified to the same effect. Guerra added that he and Kuhn would not have advised appellant to sign the stipulation if they had understood that the only effect would be to exclude the extraneous offense testimony.

Appellant and his mother also testified at the hearing. Follis again asserted that she and appellant were told by counsel that the stipulation would have the effect of reducing appellant's maximum possible sentence from life to twenty years. She also acknowledged that counsel

11

explained that the stipulation would keep out a witness's testimony.  Appellant testified that he had not understood the stipulation and that he signed it based on Kuhn's statement that it would reduce his sentence.  Appellant said that he did not understand that the stipulation would serve to exclude the extraneous offense testimony.

The court overruled the motion for new trial without making findings of fact.[4]

## INEFFECTIVE ASSISTANCE

### *Standard of Review*

We review an order denying a motion for new trial under an abuse of discretion standard.  *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004) (reviewing order denying motion for new trial on ground of ineffective assistance of counsel).  We do not substitute our judgment for that of the trial court, but rather we decide whether the trial court's decision was arbitrary or unreasonable.  *Id*.  In the absence of express findings of fact by the trial court, we must view the evidence in the light most favorable to the trial court's ruling and presume that all reasonable factual findings that could have been made against the losing party were made.  *Id*.  A trial court abuses its discretion in denying a motion for new trial only when no reasonable view of the record could support the trial court's ruling.  *Id*.[5]

---

[4] One day before the court's ruling, the State filed a written response to the motion for new trial.  Attached to the motion was an affidavit by the lead prosecutor at appellant's trial, who had not been present at the new trial hearing.  Appellant has objected to the Court considering this affidavit because it was not introduced into evidence at the hearing and there is nothing in the record to show that it was read by the trial court before it made its ruling.  We express no opinion on appellant's objections, but we have not considered the affidavit in our resolution of his point of error.

[5] When *Charles v. State* was decided, the appellate rules prohibited trial courts from making any comment on the evidence when ruling on a motion for new trial.  *See* 146 S.W.3d 204, 211

To prevail on a claim of ineffective assistance of counsel, an appellant must show that counsel made such serious errors that he was not functioning effectively as counsel and that these errors prejudiced the appellant's defense to such a degree that he was deprived of a fair trial. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Hernandez v. State*, 988 S.W.2d 770, 771-72 (Tex. Crim. App. 1999); *Hernandez v. State*, 726 S.W.2d 53, 57 (Tex. Crim. App. 1986). In reviewing a claim of ineffective assistance, we must indulge a strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). To overcome this presumption, any allegation of ineffectiveness must be firmly founded in the record and the record must affirmatively demonstrate the alleged ineffectiveness. *Mallett v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001).

There is a narrow exception to *Strickland*'s requirement that the defendant must show prejudice to the defense arising out of counsel's deficient performance. Prejudice may be presumed when the circumstances are "so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *United States v. Cronic*, 466 U.S. 648, 658 (1984). One such circumstance is when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id*. at 659.

---

(Tex. Crim. App. 2004). The rules have since been amended to permit oral or written findings of fact by the trial court, and the amended rule was in effect when the trial court overruled appellant's motion for new trial. *See* Tex. R. App. P. 21.8(b). For this reason, and because the State failed to request findings of fact, appellant argues that the "implied findings" rule should not apply. This argument fails because it is the responsibility of the non-prevailing party—appellant in this case—to request findings of fact. *See State v. Cullen*, 195 S.W.3d 696, 699 (Tex. Crim. App. 2006). If the non-prevailing party does not request findings of fact and none are made, the "implied findings" rule applies. *See id*.

*Deficient Performance*

Appellant urges that his trial attorneys were not functioning effectively as counsel when they induced him to agree to the stipulation by telling him that it would entitle him to the lesser included offense instruction and thus raise the possibility of a lesser sentence. The State responds that although appellant's attorneys may have been mistaken with respect to the lesser included offense instruction, their advice to appellant was nevertheless strategically sound.

Although the trial court did not make express findings of fact, it is clear from comments made during the new trial hearing that the court accepted as true the testimony of appellant's trial attorneys. Thus, we will assume that trial counsel told appellant that he would obtain two benefits by stipulating that Smith did not consent to his sexual conduct: the exclusion of M.M.'s extraneous offense testimony and the submission of the lesser included offense. We also assume that the trial court did not believe appellant or his mother when they testified that counsel promised them that the stipulation would have the effect of reducing his maximum possible sentence to twenty years.[6]

The stipulation foreclosed the defense from arguing that the State had failed to prove that the alleged sexual conduct was nonconsensual. But as appellant acknowledges in his brief, consent was not the only defensive theory. The stipulation did not foreclose the defense from asserting, as it did both before and after the stipulation, that the aggravating acts were not proved. Moreover, M.M.'s testimony, had it been admitted at the guilt stage, would have undercut this

---

[6] Appellant does not rely on this testimony to support his arguments to this Court.

14

defensive theory by showing that appellant had abducted another woman at gunpoint only one week after he assaulted Smith, lending additional credibility to Smith's testimony. Thus, by making the stipulation, appellant avoided weakening the argument that he should be acquitted because the sexual assaults were not shown to be aggravated at the cost of foregoing the argument that he should be acquitted because there had been no sexual assault at all. This, the State argues, was a trade worth making under the circumstances even if the stipulation did not entitle appellant to an instruction on the lesser included offense of sexual assault.

We do not decide whether appellant's trial attorneys were functioning effectively as counsel when they secured appellant's agreement to stipulate Smith's lack of consent. Even if this constituted deficient representation, we are satisfied that appellant's defense was not prejudiced.

### Prejudice to the Defense

Appellant contends that his trial counsel's performance was not only deficient, the deficiency was such as to raise a presumption of prejudice under *Cronic*. We disagree.

*Cronic* states that prejudice should be presumed when counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id*. at 659. The Supreme Court has written that *Cronic* creates a narrow exception that will infrequently apply. *Florida v. Nixon*, 543 U.S. 175, 190 (2004). For prejudice to be presumed, counsel's "failure [to test the prosecution's case] must be complete." *Bell v. Cone*, 535 U.S. 685, 697 (2002).[7] As noted above, the stipulation

---

[7] In holding that the respondent's ineffective assistance claim was governed by *Strickland* rather than by *Cronic*, the *Bell* court stated, "[R]espondent's argument is not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that

at issue in this case did not prevent counsel from asserting that the State had failed to prove that appellant was guilty of aggravated sexual assault as alleged in the indictment, and counsel did so, vigorously and at length. This is not a case in which defense counsel entirely failed to subject the prosecution's case to meaningful adversarial testing.

Arguing by inference from *Nixon*, appellant argues that before following a strategy of conceding guilt, counsel must obtain the defendant's informed consent, and that his consent was not informed in this case because of counsel's erroneous advice regarding the advantages and disadvantages of making the stipulation. *Nixon* was a capital murder case in which defense counsel conceded the defendant's guilt in order to more persuasively argue that the defendant was mentally ill and should not be sentenced to death. 543 U.S. at 181. Counsel explained this strategy to the defendant, but the defendant remained silent and never explicitly consented. *Id*. The state supreme court held that counsel's failure to obtain the defendant's explicit consent to the strategy was deficient performance that was presumptively prejudicial under *Cronic*. *Id*. at 185. The Supreme Court reversed, holding that while counsel had a duty to consult with the defendant regarding this important trial strategy, "counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent." *Id*. at 192. The Court further held that counsel's concession strategy did not constitute a complete failure to function as the prosecution's adversary and therefore the presumption of prejudice under *Cronic* did not apply, "[a]lthough such a concession in a run-of-the-mine trial might present a closer question." *Id*. at 190. The Court remanded the case to the state court for further review under the *Strickland* standard. *Id*. at 192-93.

---

of *Cronic*, this difference is not of degree but of kind." *Bell v. Cone*, 535 U.S. 685, 697 (2002).

16

We agree that a close question would be presented if trial counsel had induced appellant to concede his guilt in order to obtain a nonexistent benefit. But that is not what happened here. Although, by stipulating to the lack of consent, appellant implicitly admitted that he was guilty of sexual assault, appellant was on trial for *aggravated* sexual assault. The stipulation relieved the State of its burden to prove Smith's lack of consent, but the stipulation did not relieve the State of its burden to prove the aggravating conduct alleged in the indictment. Thus, the stipulation did not constitute a concession of guilt as in *Nixon*. We find no support in *Nixon* for appellant's assertion that, under the circumstances of this case, prejudice to the defense must be presumed simply because counsel mistakenly exaggerated the benefits that would flow from making the stipulation.

To demonstrate prejudice under *Strickland*, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. In the context of this case, this means that appellant had the burden to show that, had he not been induced by counsel to stipulate to Smith's lack of consent, there is a reasonable probability that he would not have been convicted or that his punishment would have been less harsh. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id*.

Although Smith was, by her own admission, very intoxicated on the night in question, and even though there were gaps and inconsistencies in the statements that she made, the State's case did not rest on Smith's testimony alone. The jury also heard the testimony of Smith's rescuer, Mock, and of the police officers who responded to Mock's 911 call, all of whom described Smith's injuries, disheveled appearance, and obvious terror. The jury heard similar accounts of Smith's physical and

17

emotional state from the emergency medical personnel and the nurse examiner who treated Smith on the night of the assault, and the jury saw photographs of the cut on Smith's hand, the bruises on her neck, and the abrasions on her body. The jury also saw the handcuffs and knives found in appellant's Jeep, and saw photographs of Smith's bloodstains in the Jeep and of the scratches on the gear shift lever to which Smith said that she was handcuffed. If the stipulation had not been made, the jury would also have learned at the guilt stage that appellant had abducted M.M. at gunpoint one week after the attack on Smith for the apparent purpose of sexually assaulting her. On this record, there is no reasonable probability that, but for the stipulation, the jury would not have convicted appellant of aggravated sexual assault, but would have concluded instead that appellant was not guilty because there was a reasonable doubt as to whether Smith consented to the sexual activities alleged in the indictment.

The jury heard M.M.'s testimony at the punishment stage. In addition, another woman testified that in April 1996, while she was dating appellant's brother, she accepted a ride from appellant, who took her to his house, beat her, and sexually assaulted her at knifepoint. The jury also learned that following his arrest, methamphetamine was found in appellant's Jeep, that marihuana plants were found growing in appellant's house, and that appellant spat in the face of the police officer who collected a sample of his saliva for DNA testing. There is no reasonable probability that, but for the challenged stipulation at the guilt stage, the jury would have imposed lesser punishments.

Appellant has failed to demonstrate that there is a reasonable probability that, but for his attorneys' alleged unprofessional error, the result of his trial would have been different. The trial

18

court did not abuse its discretion by overruling the motion for new trial. Appellant's point of error is overruled.

## DOUBLE JEOPARDY

In its brief to the Court, the State commendably draws our attention to a double jeopardy violation. We may consider this violation as unassigned error because it is apparent on the face of the record and also because trial counsel preserved the error by objecting below. *See Bigon v. State*, 252 S.W.3d 360, 369 (Tex. Crim. App. 2008); *Gonzalez v. State*, 8 S.W.3d 640, 643-45 (Tex. Crim. App. 2000).

Appellant was found guilty of committing three of the sexually assaultive acts proscribed by section 22.021: penetrating Smith's mouth with his sexual organ (counts one and two), causing Smith's sexual organ to contact his mouth (counts five and seven), and causing Smith's sexual organ to contact his sexual organ (counts nine, eleven, and twelve). Tex. Penal Code Ann. § 22.021(a)(1)(A)(ii), (iii). The only difference between the counts alleging the same proscribed act was the conduct alleged for aggravation. Counts one, five, and nine alleged that appellant threatened and placed Smith in fear of serious bodily injury or death. *Id*. § 22.021(a)(2)(A)(ii), (iii). Counts two, seven, eleven, and twelve alleged that appellant used and exhibited a deadly weapon, either a handgun, a knife, or his hand. *Id*. § 22.021(a)(2)(A)(iv). The district court rendered judgments of conviction on all seven counts.

The conduct defined in subsection 22.021(a)(1)(A) constitutes the gravamen of the offense of aggravated sexual assault of an adult. *See Nickerson v. State*, 69 S.W.3d 661, 671 (Tex. App.—Waco 2002, pet. ref'd); *see also Vick v. State*, 991 S.W.2d 830, 833 (Tex. Crim. App.

19

1999) (construing subsection 22.021(a)(1)(B)); *Landrian v. State*, 268 S.W.3d 532, 540 (Tex. Crim. App. 2008) (construing aggravated assault statute). The aggravating factors defined in subsection 22.021(a)(2)(A) are merely the manner or means by which a proscribed sexual assault becomes the more serious aggravated offense. *Nickerson*, 69 S.W.3d at 671; *see also Landrian*, 268 S.W.3d at 540; *Davis v. State*, No. 05-05-01694-CR, 2007 Tex. App. LEXIS 352, at *16-17 (Tex. App.—Dallas Jan. 18, 2007, no pet.) (not designated for publication).

There is no evidence that appellant penetrated Smith's mouth with his sexual organ more than once. Whether appellant committed this act while threatening Smith with death or serious bodily injury or while brandishing a firearm, only a single aggravated sexual assault offense was proved. *See Davis*, 2007 Tex. App. LEXIS 352, at *17. Appellant's convictions on both count one and count two constitute multiple punishments for the same offense in violation of the Double Jeopardy Clause. *Nickerson*, 69 S.W.3d at 671. The same analysis applies to appellant's convictions on counts five and seven for contacting Smith's sexual organ with his mouth, and to his convictions on counts nine, eleven, and twelve for contacting Smith's sexual organ with his sexual organ.

When a defendant has been convicted twice for the same offense, the remedy is to retain the conviction for the most serious offense and to set aside the other conviction. *Ex parte Cavazos*, 203 S.W.3d 333, 337 (Tex. Crim. App. 2006). As a general rule, the most serious offense is the offense for which the greatest sentence was assessed. *Id*. at 338. Accordingly, we affirm appellant's conviction on count two, for which he received a sentence of life, and we reverse his conviction on count one, for which he received a sentence of seventy-five years, and we dismiss the prosecution on that count. For the same reasons, we affirm the conviction on count seven, and we

reverse the conviction on count five and dismiss the prosecution on that count. Appellant received identical life sentences on counts nine, eleven, and twelve. We affirm the conviction on count nine, and we reverse the convictions on counts eleven and twelve and dismiss the prosecutions on those counts. *See Nickerson*, 69 S.W.3d at 671.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Pemberton and Waldrop

Affirmed in Part; Reversed and Dismissed in Part

Filed:   July 29, 2009

Do Not Publish