

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-15-00167-CR

TEODORO MIGUEL HERNANDEZ, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 428th District Court
Hays County, Texas
Trial Court No. CR-14-0339

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Moseley

# MEMORANDUM OPINION

In June 2015, a Hays County jury[1] found Teodoro Miguel Hernandez guilty of sexual assault and aggravated assault with a deadly weapon.[2] For punishment for the conviction of sexual assault, the jury returned a verdict of ten years' confinement in prison, but recommended that the imprisonment be suspended and that he be placed on community supervision for a period of ten years. However, the jury returned a verdict of seven years' confinement in prison for the offense of aggravated assault with a deadly weapon. On appeal, Hernandez contends that (1) there was insufficient evidence to establish that he used or exhibited the alleged deadly weapon during the commission of the assault as charged, (2) he was denied his Constitutional rights to an impartial jury and to effective assistance of counsel, (3) the trial court's jury instructions were in error, and (4) the alleged inconsistent jury verdicts showed that the jury did not believe he was guilty beyond a reasonable doubt.

Because we conclude that the evidence was insufficient to support the trial court's judgment of conviction as to the charge of aggravated assault with a deadly weapon, as alleged, we reverse the trial court's judgment and remand this case to the trial court for further proceedings consistent with this opinion. We affirm the trial court's judgment of conviction as to the offense of sexual assault.

---

[1]Originally appealed to the Third Court of Appeals in Austin, the Texas Supreme Court transferred this case to this Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2013). Because this is a transfer case, we apply the precedent of the Third Court of Appeals to the extent it differs from our own. *See* TEX. R. APP. P. 41.3.

[2]Hernandez was also charged with the offense of family violence assault. The jury found him not guilty of that charge, and the trial court entered a judgment of acquittal.

## I. Background

The relationship between Hernandez and Melanie Molien commenced in March 2012, when they first met. Apparently, the relationship was rocky from its outset and included allegations of infidelity. Despite their unstable relationship, the couple began to live together in August 2013, and the relationship began to be marked with physical altercations with each partner being the aggressor at different times. Even though Molien eventually moved into a residence of her own, it was not uncommon for Hernandez to spend evenings at her home and, on occasion, to stay the entire night with her there.

In March 2014, such a liaison ended with a physical confrontation between the two, with Molien being the victim. After the incident occurred, Molien contacted law enforcement officials and relayed to them her version of events of that night and early morning, telling them that her "boyfriend was there and just tried to kill [her]." This allegation prompted the arrest of Hernandez and his being charged with aggravated sexual assault, aggravated assault with a deadly weapon, and family violence assault.[3] The results of the ensuing jury trial have previously been recited. This appeal followed.

## II. Sufficiency of the Evidence

### A. Applicable Law and Standard of Review[4]

Pursuant to Section 22.01 of the Texas Penal Code, a person commits assault if he "intentionally, knowingly, or recklessly causes bodily injury to another." *See* TEX. PENAL CODE

---

[3]Hernandez was charged with impeding Molien's breathing or blood circulation.

[4]In his first issue, Hernandez claims there was insufficient evidence of his guilt as it relates only to his conviction for aggravated assault with a deadly weapon.

ANN. § 22.01(a)(1) (West Supp. 2015). Carrying this to a more serious charge, the elements of aggravated assault with a deadly weapon are that (1) the defendant (2) intentionally, knowingly, or recklessly (3) caused bodily injury to another and (4) used a deadly weapon during the commission of the assault. TEX. PENAL CODE ANN. § 22.02(a)(2) (West 2011).[5]

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The test for legal sufficiency as set out in a hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id.*

When we evaluate legal sufficiency, we must review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found, beyond a reasonable doubt, that the accused was guilty of the charged offense. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Our rigorous legal sufficiency review focuses on the quality of the evidence presented. *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving "deference to the fact-finder's duty to resolve conflicts in

---

[5]A deadly weapon is defined in the Texas Penal Code as a firearm or "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(A), (B) (West Supp. 2015). Items that are not deadly weapons per se may be deemed deadly weapons by reason of their use or intended use. *Hill v. State*, 913 S.W.2d 581, 582–83 (Tex. Crim. App. 1996). Their use or intended use must be capable of causing death or serious bodily injury. *Id.*

testimony and other evidence." *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

### B. Evidence Presented at Trial

#### 1. Molien's Testimony

Molien testified that Hernandez arrived at her house in the early morning hours and was permitted entry. Hernandez appeared certain that Molien had been entertaining other sexual partners in the house and "was like a madman" as he "roamed" though the house to determine if anyone else was present. The two eventually were in Molien's bedroom when Hernandez pulled off all of her clothes and began "scanning [her] body, looking for bruises or any, you know, signs of [her] cheating." Molien testified that Hernandez was atop her on the bed and inserted his fingers in her vagina, saying, "This is how you want it. This is how you want it, huh?" Molien stated that Hernandez' fingers were in her vagina for "no longer than twenty seconds, if that" and that she did not consent to Hernandez either removing her clothing or placing his fingers in her vagina. Hernandez continued in an apparent state of wroth, repeatedly questioning her about other sexual partners and threatening to strike her. Molien testified that she was in fear for her safety and that Hernandez was capable of physically hurting her.

Responding to Hernandez' repeated accusations and questions with denials, Molien was repeatedly struck in the face, temple, and ear by Hernandez and fell off the bed to the floor. Hernandez continued questioning Molien, striking her repeatedly.

In an attempt to divert Hernandez and to have an opportunity to close the bedroom door, Molien asked Hernandez to get her a glass of water.[6] He complied with her request and left the bedroom, at which time Molien attempted to close the door. Hernandez, detecting her efforts, screamed at her, "Neither one of us are [sic] going to make it out alive," and returned to the bedroom, throwing the water in her mouth while simultaneously choking her. She stated, "He was using one hand to choke me while he was pouring water down my throat."[7]

Finally, Molien was able to get her legs beneath Hernandez and kicked him, causing him to fall back against the window. Even though at this point Molien was thinking, "he's going to kill me, he's going to kill me, he's going to kill me," she indicated that he calmed down somewhat.

At that point, Hernandez allowed Molien to get dressed, and the pair went outside to smoke cigarettes.[8] Molien testified that while outside on the patio, she continued in her attempts to keep Hernandez calm by agreeing with whatever he said. She stated that she was scared and did not want Hernandez to take her back inside the house. Molien vomited while they were outside and asked Hernandez if he would take her to the hospital, a request which he refused. Believing that

---

[6]Molien testified that she did not have access to her telephone because Hernandez had taken it apart when he first arrived at her apartment.

[7]The jurors were allowed to watch a re-enactment of the incident, with the help of a demonstrative aid (a "dummy") and a similar sized one-gallon water bottle that was three-quarters full of liquid.

[8]On cross-examination, Molien conceded that on the night of the incident, she had given the responding officers a different timeline of the occurrences. For instance, she reported to the officers that Hernandez took her telephone away from her and removed the battery during the assault, but she testified at trial that he took her telephone from her when he initially entered her residence. In her statement to the sexual assault nurse examiner (SANE), she stated that Hernandez had struck her prior to sexually assaulting her and that he choked her before she asked for water. At trial, Molien testified that the events in her previous statements were not in correct order because she was emotionally and physically distraught and was just "trying to get everything on paper." Molien stated that the events occurred in the order in which she had testified at trial.

6

Molien had vomited ejaculate from another sexual partner, Hernandez again became incensed and grabbed Molien in an attempt to force her back into the residence with the stated object of having her perform fellatio on him. Molien testified,

> I started panicking and anything and everything I could try to do, screaming so anybody could hear me. There was a water hose attached right by the house, by the sliding glass door, that I grabbed onto and I wasn't going to let go because I did not want to go back in that house. And all the screaming, he stopped. He let me go.

At that point, Hernandez asked Molien if she intended to call the police. Molien responded that she intended to do so, and Hernandez left.

### 2. Hernandez' Testimony

Hernandez concedes that he went to Molien's residence in the early morning hours, knocked on the door, and was already angry due to the content of the exchange of text messages between them,[9] but denied that he stormed into her home in "a fit of anger." Rather, he testified that when he saw that the bed lacked sheets and was out of its normal site, he believed what he saw was consistent with someone "having sex on the bed." Hernandez testified that at that point, he was hurt but that he did not start hitting Molien at that time. Hernandez accused Molien of having another sexual partner and demanded to know his identity. Molien responded by cursing at him and then pushing him with her hands, causing him to push her back in response. He then pulled down Molien's sweat pants and stated, "Look, see, you have more bruises now." "Take your shirt off. I bet you have more." When asked why he did not leave, Hernandez stated that he was angry and was seeking the identity of her other sexual partners. He then threatened to slap

---

[9]Hernandez testified that he was also worried about his physical condition because he was concerned he had a sexually-transmitted disease which he had contracted from Molien.

Molien if she did not reveal that information and did actually slap her "pretty good" on the side of her head. He stated that Molien kicked him in the chest and that he flew back. Hernandez then went on to describe with some detail his version of the physical altercation between the two, admitting that his actions were in no way defensive in nature. He indicated that the blows he administered to her and his pulling of her hair were interrupted by his questions about the identity of whomever he alleged Molien was having sex with. When he would ask and she would not tell him, he would slap her again, slapping both sides of her face and her ears. Hernandez conceded that during the assault, Molien was attempting to defend herself, including pulling out some of Hernandez' hair.

Hernandez testified that at that point, Molien was getting up off the floor, climbed up on the bed, and backed up. Again, Hernandez informed her that if she wanted the beating to cease, she needed to divulge the identity of the other alleged sexual partner. When Molien refused to answer, Hernandez slapped her again. After a "couple of times," Molien stated, "Teddy, Teddy, stop, calm down, let's go have a cigarette." Hernandez conceded that the more Molien tried to defend herself, the harder he hit her but that the assault lasted only a few minutes, not the hours claimed by Molien. Molien asked Hernandez to get some water for her and Hernandez went into the kitchen to get water, a bag of ice, and some aspirin for her. He stated that he left the jug of water in the kitchen. They went outside together and Hernandez inquired as to "what [he could] do for this not to happen again." According to Hernandez, everything had calmed down when he noticed that she had thrown up, and he believed that she had vomited semen. Although he attempted to carry her back inside, she resisted and refused to return.

8

Hernandez asked Molien if she was going to call the police, to which she informed him that she was, so he asked her to delay the call so he could prepare for an arrest. Hernandez testified that it was then that Molien asked him to take her to the hospital. Hernandez responded, "If I do that, they'll throw me in jail." Molien told him to "[j]ust leave." Eventually, law enforcement officers arrested Hernandez at his place of employment. Hernandez denied ever choking Molien or that he placed his fingers in her vagina.

### C.     Analysis

In this case, Count II of the State's indictment against Hernandez alleged that he "[d]id then and there intentionally, knowingly, or recklessly cause bodily injury to Melanie Molien by striking the victim's head or body with the defendant's hands, and the defendant did *then and there use or exhibit a deadly weapon*, *to-wit*, *water*, *during the commission of said assault.*" (Emphasis added).

Hernandez maintains that there was insufficient evidence to establish beyond a reasonable doubt that he used or exhibited water as a deadly weapon while he was striking Molien. Hernandez contends that Molien's testimony at trial was unambiguous that he hit her approximately twenty times with his hands and that after he stopped hitting her, she asked him to get her a drink of water from the kitchen. Hernandez argues that the evidence shows it was only after he returned from the kitchen and after he had completed the assault of striking Molien that water played any role in the incident whatsoever.[10] Hernandez points out that in order for an assault to be aggravated, a deadly

---

[10]Although Hernandez makes no mention of this discrepancy, it should be noted that the indictment alleges that Hernandez waterboarded Molien as he was striking her with his hands (this being echoed in the charge to the jury). Molien's testimony does not correspond with that allegation. Molien testified that Hernandez simultaneously choked her (not that he struck her) as he poured the water on her.

weapon must be used or displayed during the commission of the assault. He contends that the evidence shows that he had completed his act of striking her before he went in the kitchen to get Molien water, and therefore, the evidence is insufficient to support a conviction for aggravated assault with a deadly weapon in accord with the allegations as stated in the indictment against him.

The State contends that Hernandez' argument fails to take into account his "continued infliction of bodily injury" after he poured the water on Molien. The State points to the fact that Molien testified that after they had been out on the patio, Hernandez attempted to force her back inside the house. The State argues that a rational jury could have found Hernandez' behavior caused "physical pain, illness, or any impairment of physical condition during the continuing assault" and, thus, that the evidence was sufficient for the jury to reach a guilty verdict on the charge of aggravated assault with a deadly weapon.

We find *Johnson v. State* to be instructive in this case. *See Johnson v. State*, 271 S.W.3d 756 (Tex. App.—Waco 2008, pet. ref'd). In that case, Johnson, the appellant, was convicted of aggravated assault of a public servant. At the time of the offense, Johnson was incarcerated. The evidence showed that Johnson had struck a correctional officer (the victim) in the jaw with his fist and then dragged her into the dayroom and took her to a bench where he held her with a piece of glass against her neck while striking her a second time. As the other correctional officers gathered around them, the victim was able to pry the glass away from her neck. One of the other officers sprayed Johnson with some disabling spray, and the incident was concluded when Johnson was subdued.

In addition to the victim, the State presented five witnesses to this event. Although some of the witnesses had seen Johnson strike the victim and each saw the victim in Johnson's clutches with the glass pressed to the victim's throat, none testified that they had seen the piece of glass in Johnson's hand either before he struck the victim or simultaneously with striking her. The victim could recall very little, having repeatedly lost consciousness from the blows administered to her by Johnson; she had no recollection of the glass being in Johnson's hand until after she regained consciousness near the conclusion of the incident.

After the State rested, the trial court denied Johnson's motion for an instructed verdict on the basis that the State had failed to present any evidence that he used or exhibited the piece of glass during the commission of the assault. Johnson testified in his own defense, admitting that he struck the victim in the jaw with his fist and dragged her to a bench in the dayroom, but denying that he struck her a second time or that he threatened her with a piece of broken glass at any point during the incident.

The indictment alleged that Johnson caused bodily injury to the victim "by striking [her] with a hand, and the defendant did then and there use or exhibit a deadly weapon, to wit: a piece of glass, during the commission of said assault." *Id*. at 759. Johnson maintained that the assault alleged in the indictment was complete after he struck the victim in the chin and that his use of the piece of glass did not happen "during the commission of" the alleged assault. *Id*. Similarly to the case at bar, the State argued "that the assault was a series of events, including the blow to the jaw and the verbal death threats and the glass to the throat." *Id*.

11

The Waco Court of Appeals construed the State's position as an assertion that the assault was a "continuing offense." *See Barnes v. State*, 824 S.W.2d 560, 561–62 (Tex. Crim. App. 1991), *overruled on other grounds by Proctor v. State*, 967 S.W.2d 840 (Tex. Crim. App. 1998). Citing *Barnes*, the appellate court wrote,

> Relying on a decision of the United States Supreme Court, the Court recognized that only in "limited circumstances" will an offense be construed as continuing in nature and held that an offense should not be so construed "unless the explicit language of the substantive criminal statute compels such a conclusion or the nature of the crime is such that [the Legislature] must assuredly have intended that it be treated as a continuing one.

*Johnson*, 271 S.W.3d at 760 (citing *Barnes*, 824 S.W.2d at 562 (quoting *Toussie v. United States*, 397 U.S. 112, 115 (1970))). Pursuant to this line of reasoning, the *Johnson* court held "that aggravated assault is not a 'continuing offense.'" *Id*. at 760. The appellate court went on to find that "the State thus had to prove that Johnson used or exhibited the piece of glass 'during the commission of the assault.'" *Id*. (citing *Curry v. State*, 30 S.W.3d 394, 404–05 (Tex. Crim. App. 2000). After a fairly lengthy discussion of the distinctions between result-oriented offenses and conduct-oriented offenses, the appellate court stated,

> Because the focus of the offense remains on the result and because the statute requires that a deadly weapon be used or exhibited "during the commission of the assault," the evidence must show that the defendant used or exhibited the weapon at some point at or before the offense is complete (*i.e.*, at or before the time the complainant sustains bodily injury).

*Id*. at 761 (citing *Phillips v. State*, 787 S.W.2d 391, 395 (Tex. Crim. App. 1990)).

In summarizing, the Waco appellate court stated that the indictment alleged that Johnson caused bodily injury to the victim by "striking her with his hand and that he used or exhibited a deadly weapon (a piece of glass) during the commission of *this* assault." *Id*. at 762–63 (emphasis

12

added). Therefore, in order for the State to obtain a conviction under the indictment, it must have presented evidence showing that Johnson used or exhibited the piece of glass "at the same time" he struck the victim with his hand. *Id*. at 763 (citing *Wade v. State*, 951 S.W.2d 886, 889 (Tex. App.—Waco 1997, pet. ref'd)). Because Johnson assaulted the victim two times, the appellate court was tasked with determining whether there existed evidence that he had used or exhibited the piece of glass during either of the assaults. The appellate court stated,

> By contrast, [a witness] testified that Johnson had [the victim] "in a headlock with a piece of glass applied to the side of her neck" as he dragged her through the dayroom. [Another witness] similarly testified that she saw Johnson dragging [the victim] through the dayroom with his hand "[a]round her throat with the piece of glass." The fact that [the victim] does not recall Johnson wielding a piece of glass at this juncture is not dispositive. *Cf. Herring v. State*, 202 S.W.3d 764, 766 (Tex. Crim. App. 2006) (evidence legally sufficient to prove use of a deadly weapon where defendant told victim he had a knife and threatened to kill her, even though she never saw knife). Therefore, viewing the testimony in the light most favorable to the verdict, the jurors could reasonably infer that Johnson was holding the glass against [the victim's] neck when he hit her the second time.

*Id*. It then overruled Johnson's point of error.

Under the indictment in this case, the State was required to present evidence that Hernandez used or exhibited a deadly weapon, i.e., water, either before he struck Molien or simultaneously with having struck her. Contrary to the State's assertion, the evidence does not reflect that he either exhibited the water or used it during the time he was striking Molien. Consequently, the jury could not infer that it did.

In the alternative, the State argues that even if we find there was insufficient evidence to support water as a deadly weapon, there remains sufficient evidence to support the jury's finding of use or exhibition of another deadly weapon, i.e., Hernandez' hands. In his brief, Hernandez

13

does not maintain that water is not a deadly weapon. Rather, he only maintains that the State failed

to prove that water was used or exhibited as a deadly weapon while Hernandez was striking

Molien. In support of his assertion, Hernandez directs us to *Gollihar v. State*, where the Texas

Court of Criminal Appeals was required to consider the existence of a material variance between

the indictment and the evidence presented at trial in relation to a sufficiency of the evidence issue.

*Gollihar v. State*, 46 S.W.3d 243 (Tex. Crim. App. 2001). In *Gollihar*, although the indictment

alleged the theft of a go-cart with the model number 136202, at trial, the State proved the theft of

a go-cart containing the model number 136203. The court held that, in the case of an alleged

variance between the evidence presented at trial and the allegations of the charging instrument, the

applicable test is one of materiality:

> A variance between the wording of an indictment and the evidence
> presented at trial is fatal only if 'it is material and prejudices [the
> defendant's] substantial rights.' When reviewing such a variance,
> we must determine whether the indictment, as written, informed the
> defendant of the charge against him sufficiently to allow him to
> prepare an adequate defense at trial, and whether prosecution under
> the deficiently drafted indictment would subject the defendant to the
> risk of being prosecuted later for the same crime.

*Sprick*, 233 F.3d at 853 (footnotes omitted). In summary, we hold that when faced
with a sufficiency of the evidence claim based upon a variance between the
indictment and the proof, only a 'material' variance will render the evidence
insufficient. Thus, the hypothetically correct charge will take into consideration
the fatal variance doctrine formerly expressed by this Court and today reaffirmed.
Allegations giving rise to immaterial variances may be disregarded in the
hypothetically correct charge, but allegations giving rise to material variances must
be included.

Applying these principles to the instant case, the question is whether the
variance between the model number of the go-cart alleged in the indictment and the
model number actually proved was a "material" one that prejudiced appellant's
substantial rights. That is, did the indictment inform appellant of the charge against

14

him sufficiently to allow him to prepare an adequate defense at trial and would the indictment subject appellant to the risk of being prosecuted later for the same crime?

*Id.* at 257 (footnotes omitted).

The court then found that (1) the State was not required to plead the model number of the stolen go-cart to give adequate notice to appellant of the charges against him, (2) there was no indication that the appellant did not know what go-cart he was alleged to have stolen, (3) there was no indication in the record that appellant was misled or surprised by the inclusion of the incorrect serial number, and (4) "[t]he needless allegation of the wrong model number did not impair appellant's ability to prepare his defense." *Id.* at 258. In overruling appellant's point of error, the court held that the variance at issue was not material and that an immaterial variance is disregarded in a sufficiency of the evidence review. *Id.*

In this case, we begin our review by examining the contents of the State's indictment against Hernandez. The three charges against Hernandez share a common gravamen—assaultive conduct. Each of the offenses requires proof that Hernandez engaged in conduct constituting assault as defined under Section 22.01(a)(1) of the Texas Penal Code as an essential element of the crime. *See* TEX. PENAL CODE ANN. § 22.01(a)(1).[11] The indictment against Hernandez alleged

---

[11]The offense of assault is defined as follows:

    (a)     A person commits an offense if the person:
         (1)     intentionally, knowingly, or recklessly causes bodily injury to another, including the person's spouse;
         (2)     intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or

that he committed (Count I) aggravated sexual assault by causing the penetration of the female organ of Molien with his fingers, without her consent, and that in the course of the same criminal episode,[12] Hernandez (a) attempted to cause Molien's death by strangulation and waterboarding, (b) by acts or words threatened to cause or place Molien in fear of death or serious bodily injury, or (c) used or exhibited a deadly weapon, to wit, water; (Count II) aggravated assault with a deadly weapon by intentionally knowingly, or recklessly causing bodily injury to Molien by *striking her head or body with Hernandez' hands* while using or exhibiting a deadly weapon, to wit, *water*, during the commission of said assault;[13] and (Count III) family violence assault by intentionally, knowingly, or recklessly impeding the normal breathing or circulation of blood of Molien, with whom he had a dating relationship, by applying pressure to the throat or neck and blocking her nose or mouth.

The State contends that its delineation of water as the deadly weapon is a non-statutory immaterial variance in the indictment. It maintains that "a variance as to which deadly weapon

---

(3)    intentionally or knowingly causes physical contact with another when the person knows or should reasonably believe that the other will regard the contact as offensive or provocative.

TEX. PENAL CODE ANN. § 22.01(a)(1)–(3) (West Supp. 2015).

[12]Section 3.01 of the Texas Penal Code defines "criminal episode" as:

[T]he commission of two or more offenses, regardless of whether the harm is directed toward or inflicted upon more than one person or item of property, under the following circumstances:
(1)    the offenses are committed pursuant to the same transaction or pursuant to two or more transactions that are connected or constitute a common scheme or plan; or
(2)    the offenses are the repeated commission of the same or similar offense.

TEX. PENAL CODE ANN. § 3.01 (West 2011).

[13]The indictment states that Hernandez used water as a deadly weapon during said "assault." The words "said assault" must refer to the specific assault described in Count II (which is that of striking Molien in the head or body).

16

was used or exhibited does not change the fact that a deadly [weapon] was used or exhibited." We disagree. The content of the indictment against Hernandez is specific in regard to the type of assault alleged (striking) and to the type of deadly weapon used (water). Contrary to the State's contention, it cannot now assume that the jury substituted Hernandez' hands as the deadly weapon when Hernandez was charged with using water as a deadly weapon. When the State charged Hernandez with aggravated assault, it was required to allege in its indictment the aggravating factor, something that it duly did. Although the State was within its discretion to allege that Hernandez choked Molien with his hands or struck Molien by using or exhibiting his hands as a deadly weapon, it apparently chose not to do so.

We also examine the trial court's charge to the jury. As to Count II (aggravated assault with a deadly weapon), the trial court's jury instructions specifically stated under the heading "Instructions of the Court for Count II Aggravated Assault with a Deadly Weapon" with sub-heading, "Accusation,"

> In Count II, the state accuses the defendant of having committed the offense of assault. Specifically, the accusation is that the defendant intentionally, knowingly, or recklessly caused bodily injury to Melanie Molien by striking Melanie Molien's head or body with the defendant's hands, and during the commission of this assault the defendant used or exhibited a deadly weapon, to wit: water.[14]

---

[14]Under the heading "Deadly Weapon," the trial court's instructions stated that "Deadly Weapon" means:

(1)     Anything manifestly designed, made, or adapted for the purpose of inflicting death or serious bodily injury; or
(2)     Anything actually used by the defendant in a manner making it capable of causing death or serious bodily injury; or
(3)     Anything that the defendant intended to use in a manner that if so used would make it capable of causing death or serious bodily injury.

17

The court's jury instructions go on to state, under the heading "Application of Law to Facts,"

> You must determine whether the state has proved, beyond a reasonable doubt, three elements. The elements are that—
>
> (1)   The defendant, in Hays County, Texas, on or about March 21, 2014, caused bodily injury to Melanie Molien; and
> (2)   The defendant did this—
>   a.   intending to cause bodily injury; or
>   b.   knowing that he would cause bodily injury; or
>   c.   with recklessness about whether he would cause bodily injury; and
> (3)   The defendant, during the alleged assault, used or exhibited a deadly weapon, to wit: water.
>
> You must agree on elements 1, 2, and 3 listed above, but you do not have to agree on the culpable mental states listed in elements 2a, 2b, and 2c above.

The indictment and the trial court's jury instructions are specific as to Count II, the charge of aggravated assault with a deadly weapon. The State's inclusion of the type of weapon that Hernandez is alleged to have used (water) is not mere surplusage. This is especially so because the State alleged three separate counts in its indictment for charges of an assaultive nature. Unlike the findings in *Gollihar*, when the State made the decision to charge Hernandez in this case with aggravated assault in Count II of its indictment, it was required to plead the aggravating factor in the indictment. It did as it was required to do, describing the water as a deadly weapon. The State selected a factual allegation that was an integral part of the charge against Hernandez. It was not a "needless" allegation; instead, it was a very relevant factor, one upon which Hernandez would have had to concentrate in order to prepare his defense.[15] *See Gollihar*, 46 S.W.3d at 258. The

---

[15]As Hernandez pointed out, it would be foreseeable to have called an expert on the issue of whether Hernandez' hands were deadly weapons in the manner in which he used them to assault Molien.

18

State was bound by its choice of the deadly-weapon allegation. Accordingly, it was required to provide sufficient evidence to the jury to prove the allegation in its indictment against Hernandez. In this undertaking, the State failed.

### D. Reformation of the Judgment

In *Thorton v. State*, 425 S.W.3d 289 (Tex. Crim. App. 2014), the Texas Court of Criminal Appeals stated:

> [A]fter a court of appeals has found the evidence insufficient to support an appellant's conviction for a greater-inclusive offense, in deciding whether to reform the judgment to reflect a conviction for a lesser-included offense, that court must answer two questions: 1) in the course of convicting the appellant of the greater offense, must the jury have necessarily found every element necessary to convict the appellant for the lesser-included offense; and 2) conducting an evidentiary sufficiency analysis as though the appellant had been convicted of the lesser-included offense at trial, is there sufficient evidence to support a conviction for that offense? If the answer to either of these questions is no, the court of appeals is not authorized to reform the judgment. But if the answers to both are yes, the court is authorized—indeed required—to avoid the "unjust" result of an outright acquittal by reforming the judgment to reflect a conviction for the lesser-included offense.

*Id.* at 299–300 (footnote omitted). In this case, the trial court gave the jury "INSTRUCTIONS OF THE COURT COUNT II LESSER-INCLUDED OFFENSE OF ASSAULT." Under the sub-heading "Application of Law to Facts," the trial court stated,

> If you determine that the State has proved, beyond a reasonable doubt, elements 1 and 2 above, but you have a reasonable doubt as to element 3, that is the defendant did then and there use or exhibit a deadly weapon, to wit: water, then you will consider the State has proven the defendant guilty of the lesser-included offense of Assault (Count II)
> To prove that the defendant is guilty of the lesser-included offense of Assault (Count II), the State must prove beyond a reasonable doubt two elements. The elements are that—

1.      the defendant caused bodily injury to Melanie Molien; and

2.      the defendant acted with intent to cause bodily injury, with knowledge that he would cause bodily injury, or with recklessness concerning whether he would cause bodily injury;

You must agree on elements 1 and 2 above. . . .

In addition to Molien's testimony that Hernandez repeatedly struck her, Hernandez testified that he grabbed Molien by her hair and that "as [he] was pulling her hair and slapping her head and face, [he] was taking her down to the floor." The fact that Hernandez had repeatedly struck her and pulled her hair was confirmed by Hernandez himself, who also acknowledged that his actions were not done in self-defense. The jury also viewed several photographs of Molien's injuries, including a swollen and blackened eye and severe bruising on her face and ear.

Based on the record, (1) the jury necessarily found all of the elements necessary to convict Hernandez of the lesser-included offense of assault, and (2) the evidence was sufficient to prove that Hernandez committed the lesser-included offense. Therefore, we reverse the trial court's judgment convicting Hernandez of aggravated assault with a deadly weapon, render a judgment of conviction of the lesser-included offense of assault, and remand the case to the trial court to conduct a new punishment hearing. *See id.* at 307.

## III.    Alleged Violations of Hernandez' Constitutional Rights[16]

Hernandez contends that his right to an impartial jury and the right to have effective assistance of counsel as guaranteed him under the Sixth Amendment to the United States

---

[16]Because we find that there was insufficient evidence to support the jury's guilty verdict as to the charge of aggravated assault with a deadly weapon, we will address Hernandez' second and third issues as they relate to his conviction for sexual assault. We decline to address Hernandez' fourth issue because the aggravated assault with a deadly-weapon charge is central to his argument.

20

Constitution were violated because a seated juror failed to disclose during voir-dire proceedings that she had a prior relationship with Hernandez' trial counsel. The State maintains there was no error because the trial court held a hearing at the time the information was revealed, the hearing was adequate, and the trial court correctly found that no bias resulted when it properly reseated the juror. The State contends, therefore, that the trial court did not abuse its discretion in refusing to grant Hernandez' motion for mistrial.

### A.     Standard of Review and Applicable Law

A trial court's denial of a motion for mistrial is reviewed for an abuse of discretion. *Gonzales v. State*, 304 S.W.3d 838, 842 (Tex. Crim. App. 2010); *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999). A trial court abuses its discretion when its decision lies outside the zone within which reasonable persons might disagree. *Gonzales*, 304 S.W.3d at 842 (citing *Smith v. State*, 286 S.W.3d 333, 339–40 (Tex. Crim. App. 2009)). "The trial court is the sole judge of the credibility of the testifying jurors." *Salazar v. State*, 38 S.W.3d 141, 148 (Tex. Crim. App. 2001).

Both the Sixth Amendment to the United States Constitution and Article I, Section 10 of the Texas Constitution provide criminal defendants the right to a trial by an impartial jury. U.S. CONST. amend. VI; TEX. CONST. art. I, § 10. The protection under the Texas Constitution is virtually identical to that offered by the Federal Constitution. *Jones v. State*, 982 S.W.2d 386, 391 (Tex. Crim. App. 1998). In *Salazar v. State*, 562 S.W.2d 480, 482 (Tex. Crim. App. [Panel Op.] 1978), the Texas Court of Criminal Appeals held that "[w]here a juror withholds material

21

information[17] in the voir dire process, the parties are denied the opportunity to exercise their challenges, thus hampering their selection of a disinterested and impartial jury." "[T]he defendant must show that the juror withheld material information during voir dire, and the information is withheld despite due diligence exercised by the defendant." *Franklin v. State* (Franklin III), 138 S.W.3d 351, 355–56 (Tex. Crim. App. 2004). "[T]he good faith of a juror is largely irrelevant when considering the materiality of information withheld." *Franklin v. State* (Franklin II), 12 S.W.3d 473, 478 (Tex. Crim. App. 2000). Although a defendant is not required to show actual bias, the information concealed by the venireperson must possess a tendency to show bias in order for harm to be shown. *Franklin III*, 138 S.W.3d at 356. If the juror did not intentionally withhold this information, that fact is nonetheless "largely irrelevant" in determining whether the information withheld was material. *Franklin II*, 12 S.W.3d at 478. A defendant must show both that error occurred and that the error resulted in harm. *Gonzales v. State*, 3 S.W.3d 915, 917 n.2 (Tex. Crim. App. 1999).

---

[17]In order for an appellate court to determine materiality, it must evaluate whether the withheld information would likely reveal the juror harbored a bias or prejudice to such a degree that he should have been excused from jury service. *Anderson v. State*, 633 S.W.2d 851, 853–54 (Tex. Crim. App. [Panel Op.] 1982); *Salazar*, 562 S.W.2d at 482. In doing so, it may

> [c]onsider, among other things, the facts of the crime, the context of the withheld information as it relates to the juror's personal life, and the physical, emotional, and psychological peculiarities of the parties. If the withheld information touches on some fundamental component of the charged crime or personal characteristic of the accused, then we would necessarily conclude the withheld information was "material" to void dire's objective of eliciting that juror's potential bias or prejudice against the accused. . . . And only those facts known by the parties *before* the previously withheld information is first disclosed are relevant to our materiality determination, because it is at that point where a trial court itself first determines the impact of the newly discovered information. If subsequent questioning or evidence shows the delayed revelation to be harmless, such evidence is necessarily relevant—but only with respect to our harm analysis.

*Sypert v. State*, 196 S.W.3d 896, 901 (Tex. App.—Texarkana 2006, pet. ref'd).

**B.     Trial Court Proceedings**

In this case, Hernandez' trial counsel asked the veniremembers:

> But before we get that going, I think the State might ask that nobody knows anybody that's involved in this process; is that correct?  Nobody knows me?  I mean, I don't just do criminal.  I do some family law and civil stuff, too.  So I want to make sure I haven't represented any of you, or worse yet, the other side.  I definitely don't want you on the jury if I was on the other side.

There was no response from the venirepanel to defense counsel's question.  Hernandez does not complain that he was not allowed to adequately ask questions of the veniremembers during voir dire, but that a venireperson, who was eventually seated as a juror, withheld material information until after the trial had begun.  From a review of the briefs, it appears that the juror informed the parties in the middle of trial that she had been in some sort of a prior relationship with defense counsel.  When the information became known to the trial court, the trial court questioned the juror outside the presence of the jury:

> THE COURT:     We are in the presence of the defendant, outside the presence of 11 members of the jury.  We have in front of us [the Juror].

> THE JUROR:  Correct.

> THE COURT:  I needed to ask you a question.  Can you continue your service as a fair and impartial juror regardless of any outside experience or relationship?

> THE JUROR:  Yes, I can.

> THE COURT:  All right.  And so you are able to say that no outside experience or relationship would affect you?

> THE JUROR:  No, sir, it will not.

> THE COURT:  All right.  Thank you for your continued service, ma'am.  Go ahead and make yourself as comfortable as possible outside.

23

The juror exited the courtroom and the trial court stated, "In addition to the items that were on the order, the court would also clarify for the record that the witness answered each question without equivocation or hesitation." The trial court quickly moved on to "talk about the demonstrative evidence." At that point, Hernandez' trial counsel stated,

> I would move for a mistrial at this time for not being able to further inquire as to this Juror's relationship with me. It's unknown whether it's a positive or negative experience. And if it's negative and she didn't disclose that to us during voir dire, I think I would have exercised a challenge for strike or peremptory strike to her at that time.

The State responded that Hernandez' counsel "had an adequate opportunity to voir dire on those issues, that the Juror was unequivocal and quick to respond to the court, who asked the ultimate issue which is relevant, which is if she can remain fair and impartial regardless of any associations that she may or may not have had." The trial court overruled trial counsel's request for a mistrial and moved on to the next order of business.

### C. Analysis

#### 1. *Franklin v. State*

In their briefs, both parties discuss *Franklin v. State*. In *Franklin I*, this Court held that because counsel had failed to perfect a bill of exceptions, it could not determine whether the information withheld by the juror was material and affirmed a conviction. *See Franklin v. State* (Franklin I), 986 S.W.2d 349, 355 (Tex. App.—Texarkana 1999), *rev'd*, 12 S.W.3d at 476. In that case, when questioned by the trial court, the juror testified that her daughter was in the same Girl Scout troop as the victim and that the juror was an adult leader in that troop. *Id*. at 352. Nevertheless, the juror testified that she could be fair and impartial. *Id*. The Texas Court of

24

Criminal Appeals reversed in *Franklin II*, reasoning that counsel had exercised due diligence and preserved error by requesting to examine the juror, stating what questions he would have asked and that he would have exercised a peremptory strike. *Franklin II*, 12 S.W.3d at 477–78. In its review following remand, the Texas Court of Criminal Appeals affirmed in *Franklin III* this Court's conclusion that reversible error had occurred. *See Franklin III*, 138 S.W.3d at 354. In *Franklin III*, the Texas Court of Criminal Appeals found that the trial court had prevented proper development of the record, that the relationship between the juror and the victim's family had a tendency to show bias, and that the record did not establish the error to be harmless beyond a reasonable doubt. *Id*. at 353.

> In *Franklin III*, the Texas Court of Criminal Appeals stated,
>
> Counsel explained that these questions were relevant to [the juror's] "potential biases" and would have uncovered information relevant to a challenge for cause. But *the trial court refused to allow counsel to ask these questions*, which we interpreted as "a direct order not to ask questions." *The trial judge's refusal to allow defense counsel to ask* [*the juror*] *questions* regarding the nature and extent of the relationship deprived [the defendant] of the ability to show actual bias or prejudice. We hesitate to hold [the defendant] to a burden of showing actual bias or prejudice *when the trial judge denied him the ability to develop evidence* of actual bias or prejudice on the record. We believe that all of these factors together—[the juror's] failure to reveal her relationship with the victim, the judge's denial of a mistrial, and the trial judge's refusal to allow defense counsel to question [the juror] about her relationship to the victim—affected [the defendant's] right to a trial by an impartial jury.

*Id.* at 355 (emphasis added) (citation omitted).

Hernandez points out that after the juror left the courtroom, he asked for a mistrial and informed the trial court that he would have asked additional questions relevant to the issue of bias. Hernandez did not request to do so. The State contends that Hernandez was required to ask the

25

trial court for the opportunity to ask the juror additional questions at the time the issue became apparent to the parties.[18] We agree with the State.

Had Hernandez asked the trial court for the opportunity to ask additional questions of the juror, and had the trial court granted that request, many of the inquiries that remain unanswered and that are now critical to our analysis might very well have been resolved. In the event the trial court denied Hernandez' request, as was the case in *Franklin*, a timely objection by defense counsel would have then been proper. Based on the record, we cannot say with any certainty that the information the juror withheld was material or that it showed either actual or implied bias. What is apparent, however, is that Hernandez did not use due diligence in an effort to find the answer to these questions. As a consequence, no error was preserved for this Court's review.

### 2.      Failure to Timely Object

To preserve a complaint for our review, a party must first present to the trial court a timely request, objection, or motion stating the specific grounds for the desired ruling if not apparent from the context. TEX. R. APP. P. 33.1(a)(1). In order for a party's objection to have been timely, he must have asserted it at the earliest possible time. *Id.* Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court's refusal to rule. TEX. R. APP. P. 33.1(a)(2). The purpose of requiring a

---

[18]In his reply brief, Hernandez contends, "[T]he way defense counsel's complaint was phrased also indicates that she had already requested the opportunity to question the juror and had been denied." Hernandez states, "The record indicates that some discussion with the court was not on the record, as the transcription begins only after [the] Juror . . . has been called to the bench." Hernandez' contention is speculation. The transcript is void of such request or objection to the trial court's denial of a request.

26

party to make a specific objection is (1) to give the court the opportunity to rule on the objection and (2) to give opposing counsel the chance to respond to the complaint. *Id.*

Even had Hernandez not asked for an opportunity to inquire further of the juror, he was required to object to the trial court's decision to allow the juror to remain on the jury and to provide the trial court with the reasoning for the objection to its ruling. Instead, Herandez asked for a mistrial shortly after the trial court had continued on with other business. Because Hernandez failed to ask for the opportunity to ask additional questions of the juror or to lodge an objection to the trial court's ruling at the appropriate time, he failed to take the requisite steps to show what injury (if any) was suffered by Hernandez by allowing the trial to proceed with the juror on the panel. We overrule Hernandez' second point of error.

## IV.    Jury Charge Error

Next, Hernandez argues the trial court erred when it instructed the jury on the issue of consent as the term related to the lesser-included charge of sexual assault. Specifically, Hernandez contends that the trial court committed egregious error in instructing that the jury could find lack of consent if it believed that "Melanie Molien [did] not consent[] and the defendant kn[ew] Melanie Molien [was] physically unable to resist." Hernandez contends that the State failed to present evidence at trial that would indicate that Molien "was unable to speak or physically move her body, nor that she had any physical impairment, was intoxicated, or in a compromised state," which would render her physically unable to resist Hernandez' actions. For the reasons below, we disagree.

## A.      Standard of Review and Applicable Law

The Texas Code of Criminal Procedure prescribes the manner of appellate review of jury charge error.  *See* TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006).  We employ a two-step process in our review of alleged jury charge error.  *See Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994).  "Initially, we determine whether error occurred and then evaluate whether sufficient harm resulted from the error to require reversal."  *Wilson v. State*, 391 S.W.3d 131, 138 (Tex. App.—Texarkana 2012, no pet.) (citing *Abdnor*, 871 S.W.2d at 731–32).  "A trial court must submit a charge setting forth the 'law applicable to the case.'"  *Lee v. State*, 415 S.W.3d 915, 917 (Tex. App.—Texarkana 2013, pet. ref'd) (quoting TEX. CODE CRIM. PROC. ANN. art. 36.14 (West 2007)).  "The purpose of the jury charge . . . is to inform the jury of the applicable law and guide them in its application.  It is not the function of the charge merely to avoid misleading or confusing the jury:  it is the function of the charge to lead and prevent confusion."  *Id.* (quoting *Delgado v. State*, 235 S.W.3d 244, 249 (Tex. Crim. App. 2007)).

The level of harm necessary to require reversal due to jury charge error is dependent upon whether the appellant properly objected to the error.  *Abdnor*, 871 S.W.2d at 732.  If a defendant does not object at trial to the charge, an appellate court will not reverse unless the record shows the error resulted in egregious harm such that he did not receive a fair and impartial trial.[19]  *See Ngo v. State*, 175 S.W.3d 738, 743–44 (Tex. Crim. App. 2005) (citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g)); *Loun v. State*, 273 S.W.3d 406, 416 (Tex.

---

[19]Hernandez did not object to this portion of the trial court's jury instructions.

28

App.—Texarkana 2008, no pet.). In this case, Hernandez failed to object to the charge at trial and, therefore, he must show any alleged error was egregiously harmful.

"Jury-charge error is egregiously harmful if it affects the very basis of the case, deprives the defendant of a valuable right, or vitally affects a defensive theory." *Stuhler v. State*, 218 S.W.3d 706, 719 (Tex. Crim. App. 2007). In making this determination, we review "the entire jury charge, the state of the evidence, the argument of counsel, and any other relevant information in the record as a whole." *Villarreal v. State*, 205 S.W.3d 103, 106 (Tex. App.—Texarkana 2006, pet. dism'd, untimely filed) (citing *Almanza*, 686 S.W.2d at 171). Direct evidence of harm is not required to establish egregious harm. *Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

**B.      Analysis**

A person commits sexual assault if he intentionally or knowingly "causes the penetration of the anus or sexual organ of another person by any means, without that person's consent." TEX. PENAL CODE ANN. § 22.011(a)(1)(A) (West 2011). The trial court's jury instructions stated that the jury must find beyond a reasonable doubt that Hernandez committed sexual assault without Molien's consent.[20] The trial court instructed the jury that the term consent "means assent in fact, whether express or apparent." The court's instructions stated:

> 2.      this penetration was without the consent of Melanie Molien because:
>
>> a.      The defendant compelled Melanie Molien to submit or participate by the use of physical force or violence; or

---

[20]The trial court properly gave its instruction on the issue of consent based on the definition of "without consent" set forth in the sexual assault statute as opposed to the definition of "consent" set forth in the general definitions of the Texas Penal Code. *Johnson v. State*, 227 S.W.3d 180, 182–83 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

> b. The defendant compelled Melanie Molien to submit or participate by threatening to use physical force or violence against the other person and the other person believes that the person has the present ability to execute the threat; or
>
> c. Melanie Molien has not consented and the defendant knows that Melanie Molien is physically unable to resist.
>
> You must all agree on elements 1 and 2 listed above, but you need not agree on which form of non-consent listed under 2a, 2b, or 2c has been proved.

Hernandez maintains that the trial court erred when it included subsection (c). Hernandez argues that the trial court had a duty to reduce the theories of culpability because the State failed to present evidence that Molien "was unable to speak or physically move her body, nor that she had any physical impairment, was intoxicated, or in a compromised state." In addition, Hernandez contends there was insufficient evidence, or at least "not overwhelming" evidence regarding the two other means in which the State could prove lack of consent.

Hernandez directs us to the discussion in *Sanchez v. State* regarding the factors to be analyzed when a trial court has given a jury an instruction to convict on a theory that was not supported by the evidence. *See Sanchez v. State*, 376 S.W.3d 767, 773 (Tex. Crim. App. 2012). In that case, the court found that the analysis should be based on (1) the likelihood that the verdict was based on the erroneous portion of the charge, (2) whether the evidence was sufficient to convict on the permissible theories included in the charge, and (3) whether there was overwhelming evidence of guilt. *Id.* at 775.

Although there is no evidence that at the time of the assault Molien was under some deficiency (such as intoxication) that would have rendered her more susceptible to victimization in such an offense, there are other factors to be considered, such as the size, weight, and strength

30

of the respective parties. Further, the testimony of both Hernandez and Molien affirmed that their relationship had a history of physical abuse. There was, therefore, evidence that both parties were aware that Hernandez had succeeded in physically abusing Molien in the past.

As previously stated, Molien described Hernandez' behavior at the outset of their encounter as "psychotic" and as that of a "madman" (causing her fear) and that Hernandez had previously accused her of sexual infidelity. Hernandez admitted that he told her to take her top off and that he pushed her down on the bed and pulled her sweat pants down, during which activity, Molien was "definitely making noise, screaming somewhat" as she attempted to defend herself. Molien testified that when Hernandez placed his fingers in her vagina, she told him to get off of her and "this is not what I want," believing that at that time, she thought that "he [had] lost his [expletive] mind." Molien denied having wanted (or having consented) to engage in sex with him, to having him insert his finger in her vagina, or to his removal of her clothes. Molien also testified that events of abuse by Hernandez had occurred in the past and that she believed him to be capable of hurting her.

Whether this conduct came about due to the application of physical force (subsection a), the use of threats (subsection b), or because Hernandez knew Molien could not stop him from assaulting her (subsection c), there was sufficient evidence for the trial court to include all three theories in its charge, thereby allowing the jury to apply whichever of these it chose—or to not apply any of them. Moreover, according to the evidence, there is a great likelihood that the jury found that Molien did not willingly consent to Hernandez' actions, but that her independent will

31

was overwhelmed by Hernandez' threats, coupled with his past history of physical abuse following his expressions of jealousy as well as his then-current state of mind.

Finally, Hernandez' own testimony is key to this issue. The trial court instructed the jury that it could find Hernandez guilty of sexual assault only if it believed beyond a reasonable doubt that Hernandez inserted his fingers in Molien's vagina without her consent. The jury was then required to determine if this had taken place and, if it found that it did occur, whether this was done without Molien's consent. It is in the sole province of the jury to reconcile conflicts, contradictions, and inconsistences in the evidence. *Tran v. State*, 221 S.W.3d 79, 88 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (citing *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim. App. 1982)). Apparently, the jury chose to believe Molien's testimony that this was done and that it occurred without her consent.

For these reasons, we find the trial court's instruction on the issue of consent was not in error and, even if we consider that it was error, it did not result in egregious harm to Hernandez. We overrule Hernandez' third point of error.

## V.     Conclusion

We reverse the trial court's judgment convicting Hernandez of and sentencing him for the crime of aggravated assault with a deadly weapon and, in lieu of that judgment, render a judgment convicting Hernandez of the lesser-included offense of assault.  Further, we remand this matter to the trial court for a new punishment hearing for the offense of assault.  We affirm the trial court's judgment of conviction as to the offense of sexual assault in all respects.


Bailey C. Moseley
Justice


Date Submitted:        May 18, 2016
Date Decided:          August 5, 2016

Do Not Publish